[984 NE2d 893, 960 NYS2d 695]

YAAKOV LICCI, a Minor, by His Father and Natural Guardian, ELIHAV LICCI, and by His Mother and Natural Guardian, YEHUDIT LICCI, et al., Appellants, v LEBANESE CANADIAN BANK, SAL, Respondent, et al., Defendant.

Argued October 10, 2012; decided November 20, 2012

328

**POINTS OF COUNSEL**

*The Berkman Law Office, LLC*, Brooklyn (*Robert J. Tolchin* of counsel), and *Meir Katz* of the Maryland bar, admitted pro

hac vice, for appellants. I. The exercise of personal jurisdiction over Lebanese Canadian Bank, SAL is entirely consistent with federal constitutional due process limitations. (*International Shoe Co. v Washington*, 326 US 310; *Hanson v Denckla*, 357 US 235.) II. Defendant's communications with and use of American Express Bank Ltd.'s services in New York to conduct business in New York constitute a "transact[ion]" of business for the purposes of CPLR 302 (a) (1). (*Deutsche Bank Sec., Inc. v Montana Bd. of Invs.*, 7 NY3d 65; *Kreutter v McFadden Oil Corp.*, 71 NY2d 460; *Chloe v Queen Bee of Beverly Hills, LLC*, 616 F3d 158; *George Reiner & Co. v Schwartz*, 41 NY2d 648; *Fischbarg v Doucet*, 9 NY3d 375; *Indosuez Intl. Fin. v National Reserve Bank*, 98 NY2d 238; *Banco Ambrosiano v Artoc Bank & Trust*, 62 NY2d 65.) III. The "articulable nexus" and "substantial relationship" tests under CPLR 302 (a) (1) require only that defendant's transaction(s) and plaintiffs' cause of action are related. (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460; *SPCA of Upstate N.Y., Inc. v American Working Collie Assn.*, 18 NY3d 400; *Johnson v Ward*, 4 NY3d 516; *Fischbarg v Doucet*, 9 NY3d 375; *McGowan v Smith*, 52 NY2d 268; *Talbot v Johnson Newspaper Corp.*, 71 NY2d 827; *State of New York v Patricia II.*, 6 NY3d 160; *Longines-Wittnauer Watch Co. v Barnes & Reinecke*, 15 NY2d 443; *Simonson v International Bank*, 14 NY2d 281.) IV. Alternatively, if this Court concludes that CPLR 302 (a) (1)'s "arising from" language denotes causation, it denotes mere "but-for" causation rather than proximate causation. (*Boim v Holy Land Found. for Relief & Dev.*, 549 F3d 685.) V. Alternatively, if this Court concludes that CPLR 302 (a) (1)'s "arising from" language denotes proximate causation, it should find an exception for cases arising from acts of terrorism. (*Doundoulakis v Town of Hempstead*, 42 NY2d 440.) VI. Plaintiffs' factual allegations and the legal elements of their claims adequately relate to Lebanese Canadian Bank, SAL's transactions in New York. (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460; *Longines-Wittnauer Watch Co. v Barnes & Reinecke*, 15 NY2d 443.) VII. Plaintiffs' position is modest and does not open the proverbial "floodgates of litigation."

*DLA Piper LLP*, New York City (*Jonathan D. Siegfried, Andrew Deutsch* and *Joshua Sprague* of counsel), for respondent. I. The correspondent bank relationship alleged in the complaint does not constitute a transaction of business within the meaning of CPLR 302 (a) (1). (*McKee Elec. Co. v Rauland-Borg Corp.*, 20 NY2d 377; *Ehrenfeld v Bin Mahfouz*, 9 NY3d 501; *Fischbarg v Doucet*, 9 NY3d 375; *Amigo Foods Corp. v*

*Marine Midland Bank-N.Y.*, 39 NY2d 391; *Faravelli v Bankers Trust Co.*, 85 AD2d 335, 59 NY2d 615; *Nemetsky v Banque de Developpement de la Republique du Niger*, 65 AD2d 748, 48 NY2d 962; *Taub v Colonial Coated Textile Corp.*, 54 AD2d 660; *Tamam v Fransabank SAL*, 677 F Supp 2d 720; *Daventree Ltd. v Republic of Azerbaijan*, 349 F Supp 2d 736; *Exchange Natl. Bank of Chicago v Empresa Minera Del Centro Del Peru S.A.*, 595 F Supp 502.) II. The complaint does not set forth a substantial relationship between the maintenance and use of Lebanese Canadian Bank, SAL's correspondent bank account and plaintiffs' claims. (*Fischbarg v Doucet*, 9 NY3d 375; *Deutsche Bank Sec., Inc. v Montana Bd. of Invs.*, 7 NY3d 65; *Kreutter v McFadden Oil Corp.*, 71 NY2d 460; *McGowan v Smith*, 52 NY2d 268; *SPCA of Upstate N.Y., Inc. v American Working Collie Assn.*, 18 NY3d 400; *Frummer v Hilton Hotels Intl.*, 19 NY2d 533; *Kramer v Vogl*, 17 NY2d 27; *Ehrlich-Bober & Co. v University of Houston*, 49 NY2d 574; *Banco Ambrosiano v Artoc Bank & Trust*, 62 NY2d 65; *Indosuez Intl. Fin. v National Reserve Bank*, 98 NY2d 238.) III. Lebanese Canadian Bank, SAL is not subject to personal jurisdiction in New York under the alternate standards proposed by plaintiffs. (*Monahan v Weichert*, 82 AD2d 102; *Samuels v American Cyanamid Co.*, 130 Misc 2d 175; *Carter v Full Serv., Inc.*, 29 AD3d 342; *Montgomery v Pena*, 19 AD3d 288; *Russac v Crest Hollow Country Club of Woodbury*, 252 AD2d 548; *Ehrenfeld v Bin Mahfouz*, 9 NY3d 501; *Parke-Bernet Galleries v Franklyn*, 26 NY2d 13; *Deutsche Bank Sec., Inc. v Montana Bd. of Invs.*, 7 NY3d 65; *Ferrante Equip. Co. v Lasker-Goldman Corp.*, 26 NY2d 280.)

**OPINION OF THE COURT**

READ, J.

Plaintiffs are several dozen United States, Canadian, and Israeli citizens who reside in Israel and were injured, or whose family members were killed or injured, in rocket attacks allegedly launched by Hizballah during the Second Lebanon War in July and August 2006. Hizballah is designated by the United States Department of State as an Islamic terrorist organization. Plaintiffs brought suit in July 2008 in Supreme Court against the Lebanese Canadian Bank, SAL (LCB or the bank), a now defunct bank headquartered in Beirut,[1] claiming that LCB, with

---

1. In February 2011, the United States Department of the Treasury designated LCB as a "primary money laundering concern" (76 Fed Reg 9403

the aid of codefendant American Express Bank (AmEx), assisted Hizballah in committing these illegal attacks by facilitating international monetary transactions through the Shahid Foundation (Shahid or the foundation),[2] an entity the complaint identifies as part of the "financial arm" of Hizballah. After AmEx removed the lawsuit to the United States District Court for the Southern District of New York, plaintiffs filed an amended complaint in January 2009, bringing claims against LCB, depending on their citizenship, for primary and aiding-and-abetting liability for international terrorism under the Anti-Terrorism Act[3] (United States citizens); aiding-and-abetting liability for genocide, war crimes and crimes against humanity in violation of international law, as made actionable by the Alien Tort Statute (ATS)[4] (various Canadian and Israeli citizens); and negligence and breach of statutory duty in violation of Israeli law[5] (all but four plaintiffs). Plaintiffs asserted personal jurisdiction over LCB under New York's long-arm statute, which states at CPLR 302 (a) (1) as follows:

> "(a) Acts which are the basis of jurisdiction. As to a cause of action *arising from any of the acts enumerated in this section,* a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> "1. *transacts any business within the state . . . ;"* (emphases added).

---

[Feb. 17, 2011]). The privately-owned bank subsequently merged with the Lebanese subsidiary of the French bank, Société Générale SA.

2. "Shahid," translated as "Martyr," allegedly provides support for Hizballah fighters and their surviving families. There is evidence the foundation is involved with the overall financing of Hizballah's activities.

3. "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees" (18 USC § 2333 [a]).

4. "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States" (28 USC § 1350).

5. "[A] person who by his negligence causes damage to another commits a civil wrong" (Israeli Civil Wrongs Ordinance § 35); "Breach of statutory obligation . . . (a) A person commits a breach of a statutory obligation if he does not comply with an obligation imposed on him under any enactment [if intended for the benefit or protection of another person, which means] (b) . . . it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general or of persons of a category or definition to which that certain person belongs" (*id.* § 63).

In April 2009, LCB moved under Federal Rules of Civil Procedure rule 12 (b) (2) to dismiss the complaint for lack of personal jurisdiction, and under Federal Rule 12 (b) (6) for failure to state a claim upon which relief can be granted.[6] Plaintiffs opposed LCB's motion and submitted evidence linking Hizballah and Shahid, including a declaration from a former Israeli counter-terrorism official attesting to Shahid's status as a financial front for Hizballah. LCB did not operate branches or offices, or maintain employees, in the United States. Its sole point of contact with the United States was a correspondent banking account with AmEx in New York. Plaintiffs allege that LCB used this correspondent account with AmEx to transfer several million dollars by means of "dozens" of international wire transfers on behalf of Shahid; that LCB knew that Hizballah was a terrorist organization and that Shahid was part of its financial arm; that the wire transfers "caused, enabled and facilitated the terrorist rocket attacks" that injured them and their families; and that LCB knew that Hizballah required wire transfer services in order to operate, plan, prepare for and carry out such terrorist attacks. Plaintiffs also claim that LCB's official policy "continuously supports and supported Hizbollah and its anti-Israel program, goals and activities"; and that LCB carried out the wire transfers "to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel."

On March 31, 2010, the District Court Judge granted LCB's motion to dismiss for lack of personal jurisdiction, concluding that plaintiffs had not made a prima facie showing under CPLR 302 (a) (1). First, the Judge concluded that LCB had not "transacted business" within the meaning of section 302 (a) (1) because "mere maintenance of [a] correspondent bank account with a financial institution in New York is not, standing alone, a sufficient basis to subject a foreign defendant to personal jurisdiction," citing *Tamam v Fransabank SAL* (677 F Supp 2d

---

**6.** AmEx also moved to dismiss under Federal Rule 12 (b) (6). Plaintiffs, in their amended complaint, pleaded a single cause of action against AmEx for negligence under Israeli law. The District Court Judge decided there was no actual conflict between the applicable New York and Israeli substantive law, and the pleadings were insufficient to state a negligence claim against AmEx under New York law (704 F Supp 2d 403, 408-411 [SD NY 2010]). The Second Circuit affirmed solely on the basis that, even assuming there was no actual conflict, a choice-of-law analysis required application of New York law to plaintiffs' negligence cause of action against AmEx, and plaintiffs conceded that this claim failed if New York law applied (672 F3d 155 [2012]).

720, 727 [SD NY 2010]);[7] and **active execution** through New York of dozens of wire transfers totaling millions of dollars over a multi-year period" does not convert "mere maintenance" into "a 'use' of a correspondent account . . . sufficient to confer jurisdiction over a foreign bank" since "no meaningful distinction may be drawn between a foreign bank's maintenance of a correspondent account to effect international wire transfers and its indiscriminate use of that account for that exact purpose" (704 F Supp 2d at 407-408).

Second, the District Court Judge opined that plaintiffs' claims did not "arise from" LCB's wire transfers in New York because no "articulable nexus or substantial relationship exist[ed] between LCB's general use of its correspondent account for wire transfers through New York and the specific terrorist activities by Hizbollah underlying plaintiffs' claims," again citing *Tamam* (*id.* at 408; *see* n 7, *supra*). He considered it important that although "plaintiffs allege[d] that [the] transferred funds at issue 'substantially increased' Hizbollah's ability to commit rocket attacks, including the ones in which plaintiffs were harmed[, they] themselves [were] not customers of [LCB or AmEx], nor did they have any financial interest in the wired funds" (*id.*). Next,

---

**7.** In *Tamam*, which LCB mentions throughout its brief, Israeli citizens who were injured or whose family members were killed in the missile attacks during the Second Lebanon War sued five Lebanese banks (not including LCB) under the ATS. The plaintiffs alleged that the banks' provision of correspondent banking services to various parties associated with Hizballah constituted terrorism financing as well as conspiracy and aiding and abetting Hizballah to commit genocide, crimes against humanity, war crimes and terrorism. The court dismissed the complaint for lack of personal jurisdiction, finding first that the Lebanese banks did not transact business in New York because the plaintiffs (unlike plaintiffs here) did not allege actual transfers from Hizballah front group accounts in Lebanon through correspondent banks in New York; specifically, the "only one relevant jurisdictional allegation" was that, " '[o]n information and belief, [the Lebanese banks] processed funds and cleared U.S. dollars for [the] direct benefit [of the Islamic Resistance Support Organization (IRSO), alleged to be a Hizballah-controlled entity tasked with raising funds to purchase weapons,] through the United States in this District' " (677 F Supp 2d at 727). Acknowledging that "[w]hile the processing of IRSO funds through correspondent banks may indicate that [the Lebanese banks] purposefully availed themselves of business opportunities in New York," the court concluded that "the use of correspondent accounts in New York nonetheless [could not] form the basis of personal jurisdiction because the Amended Complaint [did] not set forth a 'substantial relationship' between the correspondent bank accounts and Hizbullah's terrorist activity" (*id.*); specifically, "the events giving rise to the physical injuries and deaths for which Plaintiffs [sought] redress [were] missile attacks in Israel, not funds transfers in New York" (*id.* at 728). The *Tamam* plaintiffs did not appeal the dismissal of their complaint.

the Judge observed that the harms suffered by plaintiffs and their family members were caused by rockets, not banking services. As a result, he concluded, "LCB's maintenance or use of its correspondent bank account [was] too attenuated from Hizbollah's attacks in Israel to assert personal jurisdiction based solely on wire transfers through New York" (*id.*).

Additionally, the District Court Judge denied plaintiffs' "alternative request" to conduct limited jurisdictional discovery because "[t]he Court's finding, that LCB's correspondent banking activities [were] insufficient to subject it to jurisdiction, renders the proposed discovery sought by plaintiffs futile" (*id.*). Having granted LCB's motion to dismiss the complaint for lack of personal jurisdiction, the Judge did not consider whether the pleadings stated a cognizable legal claim.

Plaintiffs appealed the dismissal to the United States Court of Appeals for the Second Circuit.[8] Noting that in order to determine whether personal jurisdiction exists under CPLR 302 (a) (1), " 'a court must decide (1) whether the defendant "transacts any business" in New York and, if so, (2) whether [the] cause of action "aris[es] from" such a business transaction' " (673 F3d 50, 60 [2012], quoting *Best Van Lines, Inc. v Walker*, 490 F3d 239, 246 [2d Cir 2007]), the Second Circuit has asked us to resolve two questions of New York law regarding this two-prong jurisdictional analysis, which we now consider.

## Certified Question No. 1

"(1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of a foreign client, constitute a 'transact[ion]' of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?" (673 F3d at 66.)

In asking us this, the Second Circuit observed that we had "apparently not yet addressed the precise question" of "whether a foreign bank's frequent use of a correspondent account in New York to effect international wire transfers on behalf of an overseas client is an act directed with sufficient purposefulness at New York to constitute a transaction of business" under our long-arm statute (673 F3d at 62-63). As the court recognized,

---

**8.** Plaintiffs did not appeal the lower court's denial of their alternative request for jurisdictional discovery.

though, we have discussed similar or related issues in several decisions, first and perhaps most importantly in *Amigo Foods Corp. v Marine Midland Bank-N.Y.* (39 NY2d 391 [1976]; *see also Ehrlich-Bober & Co. v University of Houston*, 49 NY2d 574 [1980] [upholding personal jurisdiction over defendant public university located in Texas based upon use of a correspondent bank in New York to carry out a transaction with plaintiff New York securities dealer where other contacts existed—i.e., the disputed "reverse repurchase" agreements involved phone calls and visits to plaintiff's office in New York, and the placing of a securities order and delivery and payment in that office]; *Banco Ambrosiano v Artoc Bank & Trust*, 62 NY2d 65 [1984] [quasi-in-rem jurisdiction exists where defendant Bahamian bank regularly used its New York correspondent account to accomplish its international banking business, including the loan transaction at issue]; *Indosuez Intl. Fin. v National Reserve Bank*, 98 NY2d 238 [2002] [upholding personal jurisdiction over defendant Russian bank that maintained a bank account in New York and regularly used it in connection with currency-exchange options transactions, thus establishing a "course of dealing" in New York]).

Plaintiff Amigo Foods Corporation (Amigo), a New York wholesaler, contracted to buy several truckloads of potatoes from defendant E. H. Parent, Inc. (Parent), a Maine potato grower and distributor; payment was to be made at or through Aroostook Trust Company (Aroostook), a Maine bank. Amigo obtained a letter of credit in New York from defendant Marine Midland Bank (Marine), which delivered it to Aroostook's New York correspondent, defendant Irving Trust Company (Irving). Amigo alleged that Parent refused to accept payment and thus breached the contract or, alternatively, that the banks wrongfully failed to deliver and pay Parent in accordance with the terms of the letter of credit. Parent, for its part, claimed never to have received payment and cross-claimed against the banks.

Aroostook made a pre-answer motion to dismiss for lack of personal jurisdiction, stating in its supporting affidavit that " '[b]eyond the notification to its depositor of the arrival of the Letter of Credit and the notification to Irving . . . , who had forwarded the Letter of Credit . . . , [it] took no action, and had none to take' "; and, therefore, "did not act in New York out of which the cause of action arose" (*Amigo Foods*, 39 NY2d at 394). In opposition, Amigo alleged that Aroostook and Irving were agents or, alternatively, their relationship was uncertain

and so depositions were warranted on the question of jurisdiction. Supreme Court agreed that depositions were called for, but the Appellate Division, with two Justices dissenting, reversed and granted Aroostook's motion to dismiss, concluding that Irving,

> "as Aroostook's correspondent, was not the latter's agent in New York, but, rather, these banks were, at most, independent contractors with respect to each other. Aroostook, itself, not having transacted any business here and not having purposefully interjected itself into the transactions here and Irving, not constituting its agent here, it follows that there was no transaction of business in New York by Aroostook." (48 AD2d 628, 629 [1st Dept 1975] [citations omitted].)

We reversed, holding that discovery should go forward because Amigo "alleged that an agency relationship exist[ed] between Aroostook and Irving and, from the pleadings and affidavits, it [was] obvious that their position [was] not frivolous" (39 NY2d at 395). Notably, in so holding we rejected both Amigo's position "that the undisputed fact that Irving [was] the New York correspondent for Aroostook [was] sufficient, in and of itself, to resolve the jurisdictional issue in [its] favor"; and Aroostook's counter, adopted by the Appellate Division, "that correspondent banks [were], at best, independent contractors with respect to each other and, thus, that their relationship cannot serve as a jurisdictional basis" (id. at 395-396). It was in this context that we stated as follows:

> "In sum, we conclude that, standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [CPLR 302 (a) (1)]" (id. at 396).

Disclosure proceedings, we concluded, should reveal "whether Aroostook purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws . . . and, particularly, the precise nature of its relationship with Irving vis-à-vis the handling of letters of credit" (id., citing Hanson v Denckla, 357 US 235, 253 [1958]).

After discovery was completed, Aroostook again unsuccessfully moved to dismiss. The Appellate Division unanimously reversed (61 AD2d 896 [1st Dept 1978]), and this time we

affirmed (46 NY2d 855 [1979]). The facts disclosed during discovery, as related by the Appellate Division, showed that Aroostook had a long-standing correspondent banking relationship with Irving, with whom Aroostook maintained a relatively small checking account. As Parent was making demands for payment, Amigo directed Marine to wire funds to Parent for its account, and Marine, in the interest of speed, chose to deposit those funds with Irving in New York to the credit of Aroostook for the benefit of Parent. Irving informed Aroostook of the deposit; Aroostook, in turn, informed Parent; Parent directed Aroostook to reject the funds; and Aroostook instructed Irving to do so. The Appellate Division remarked that

> "[o]n the previous appeal, the Court of Appeals said: 'Standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [CPLR 302 (a) (1)].' In our view, disclosure has revealed nothing which forms the basis for long-arm jurisdiction over Aroostook in the present case. In particular, Aroostook has not 'purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws.' *On the contrary, it has passively and unilaterally been made the recipient of funds which at its customer's direction it has declined*" (61 AD2d 896, 897 [citations omitted; emphasis added]).

As the Second Circuit commented, the general statement in *Amigo Foods* that a correspondent banking relationship "standing by itself" is insufficient to establish long-arm jurisdiction has been interpreted by "[s]ome New York State courts" to mean that "a nondomiciliary defendant's maintenance *and use* of such an account in New York, standing alone, [is] *ipso facto* insufficient to support personal jurisdiction under the New York long-arm statute" (673 F3d at 64 [emphasis added]). Relatedly, federal district court judges in the Circuit have cited these state court decisions and the general statement in *Amigo Foods* "to conclude that the 'mere maintenance' of a correspondent bank account in New York does not suffice to establish personal jurisdiction there" (*id.* at 65).

The Second Circuit then went on to explain that "[a]ssuming for present purposes that this 'mere maintenance' principle is a faithful articulation of [the] decision in *Amigo Foods*," that

principle's application to the facts of this case is unclear because there are arguably several interpretations of the qualifier "mere"—i.e., "that it is intended to distinguish the 'maintenance' of an account from its active use," as plaintiffs suggest; "that other types of contacts with the forum—such as borrowing money in New York, signing notes payable in New York, or negotiating agreements in New York—are also required"; or "that a transaction of business in New York will not suffice unless the plaintiff's cause of action also 'arise[s] from' that transaction—in other words that the second prong of the test must also be satisfied" (*id.* at 65). The court then suggested that perhaps

> "*Amigo Foods* [was] best read as standing for the proposition that the first prong of the long-arm jurisdiction test under [CPLR 302 (a) (1)] . . . may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful" (*id.* at 66).

This is an accurate summing up of New York law. The jurisdictional inquiry under CPLR 302 (a) (1) necessarily requires examination of the particular facts in each case. And although determining what facts constitute "purposeful availment" is an objective inquiry, it always requires a court to closely examine the defendant's contacts for their quality (*see Fischbarg v Doucet*, 9 NY3d 375, 380 [2007]). Thus, in *Amigo Foods* we focused on the nature and extent of Aroostook's involvement in the deposit of funds intended to pay Parent in the correspondent account that Aroostook maintained at Irving in New York. As discovery revealed, Aroostook's purported use of the account in this transaction, the sole potential basis for personal jurisdiction, was essentially adventitious—i.e., it was not even Aroostook's doing.

In the banking context, the requisite inquiry under CPLR 302 (a) (1)'s first prong may be complicated by the nature of interbank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States. As a result, determining in an individual case whether a foreign bank's maintenance and use of a correspondent account is purposeful or coincidental may often prove more difficult than

was the case in *Amigo Foods*, once the facts there were established. Nonetheless, complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a "course of dealing" (*see Indosuez*, 98 NY2d at 247)—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

## Certified Question No. 2

"(2) Do the plaintiffs' claims under the Anti-Terrorism Act, the A[lien] T[ort] S[tatute],[9] or for negligence or breach of statutory duty in violation of Israeli law, 'aris[e] from' LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?" (673 F3d at 74.)

We have interpreted the second prong of the jurisdictional inquiry to require that, in light of all the circumstances, there must be an "articulable nexus" (*McGowan v Smith*, 52 NY2d 268 [1981]) or "substantial relationship" (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460 [1988]) between the business transaction and the claim asserted. We have consistently held that causation is not required, and that the inquiry under the statute is relatively permissive (*see McGowan*, 52 NY2d at 272; *Kreutter*, 71 NY2d at 467). But these standards connote, at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.[10] In effect,

---

**9.** As the Second Circuit pointed out, the United States Supreme Court will soon decide whether the ATS provides subject matter jurisdiction for federal courts to entertain civil actions against corporations for violations of customary international law (*see Kiobel v Royal Dutch Petroleum Co.*, 621 F3d 111 [2d Cir 2010], *cert granted* 565 US —, 132 S Ct 472 [2011]). Depending on the outcome, *Kiobel* may render moot the question of whether personal jurisdiction exists over plaintiffs' ATS claim (*see* 673 F3d at 73).

**10.** Indeed, in framing its inquiry about the second prong, the Second Circuit remarked that although the lower court correctly observed that the rockets launched by Hizballah were "the alleged immediate cause" of the damages claimed, plaintiffs were suing LCB "for its role in the transfer of funds to Hizballah[, and] the jurisdictional nexus analysis directs [the court] to consider the relationship between . . . plaintiffs' claims and LCB's alleged transactions in New York," not "reach[ ] a conclusion that properly bears upon the ultimate merits of plaintiffs' claims, which seek to hold LCB liable for damages allegedly inflicted by Hizballah" (673 F3d at 67-68).

the "arise-from" prong limits the broader "transaction-of-business" prong to confer jurisdiction only over those claims in some way arguably connected to the transaction. Where this necessary relatedness is lacking, we have characterized the claim as "too attenuated" from the transaction, or "merely coincidental" with it (see *Johnson v Ward*, 4 NY3d 516, 520 [2005]).

Accepting the complaint's allegations as true, LCB's use of its AmEx correspondent account to transfer money for Shahid provided money for Hizballah to carry out terrorist violence, including the 2006 rocket attacks. Application of the second prong of the jurisdictional inquiry varies according to the nature and elements of the particular causes of action pleaded; here, LCB's alleged breach of various statutory duties. As personal jurisdiction is fundamentally about a court's control over the person of the defendant, the inquiry logically focuses on the defendant's conduct. Again, the complaint alleges that LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars. Taken as true, LCB arguably thereby violated duties owed to plaintiffs under the various statutes asserted as a basis for subject matter jurisdiction. Furthermore, the alleged breaches occurred when LCB used the New York account. Again, whether or not plaintiffs can prove these allegations at trial, including showing links between Shahid and Hizballah, and whether or not these allegations state a claim under the various statutes, the pleadings establish the "articulable nexus" or "substantial relationship" necessary for purposes of personal jurisdiction.

While it may be that LCB could have routed the dollar transactions on behalf of Shahid elsewhere, the fact that LCB used a New York account "dozens" of times indicates desirability and a lack of coincidence. Presumably, using the AmEx account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain Shahid as a customer and to support its allegedly terrorist activities and programs.

In sum, repeated use of the correspondent account shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction and the alleged breaches of statutory duties. LCB did not route a transfer for a terrorist group once or twice by mistake. Rather, plaintiffs allege that LCB deliberately used a New York account again and again to effect its support of Shahid and shared terrorist goals.

Not all elements of the causes of action pleaded are related to LCB's use of the correspondent account. And the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets. Yet CPLR 302 (a) (1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.

Accordingly, the certified questions should be answered in the affirmative.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH and PIGOTT concur.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in the affirmative.