Garcia, J.
(concurring). This case calls upon us to again examine when the use of a New York correspondent bank account by a foreign bank is sufficient to confer personal jurisdiction over that foreign bank under this State’s long-arm statute.
The majority and dissent disagree on whether the conduct of defendant here, a Swiss bank, was sufficient to satisfy the first prong of our long-arm test—the transaction of business within the state. I agree with the majority that defendant’s conduct was sufficient to confer personal jurisdiction. However, given the dissent’s dire warning that we “risk[ ] upending over 40 years of precedent” (dissenting op at 339), I write separately simply to make clear we do no such thing.
L
The substance of plaintiff’s allegations are not in dispute. Nor is the rule requiring us to accept those allegations as true *333 in deciding the issue of personal jurisdiction (see Licci v Lebanese Can. Bank, SAL, 20 NY3d 327, 340 [2012]).
Plaintiff Rasheed A1 Rushaid is a Saudi resident and co-owner of plaintiff A1 Rushaid Petroleum Investment Corporation, a Saudi company that in turn owns plaintiff A1 Rushaid Parker Drilling, Ltd. (ARPD). Defendants are Pictet & Cie (Pictet), a private bank with its principal place of business in Geneva, Switzerland, Vice-President and Client Relationship Manager Pierre-Alain Chambaz and Pictet’s eight general partners.
Plaintiffs commenced this action in New York state court asserting that defendants were active participants in a kickback and money-laundering scheme orchestrated by three of ARPD’s employees.
ARPD contracted to build six oil rigs for Saudi Arabia’s national oil company. Three ARPD employees responsible for procuring services and vendors for the project allegedly breached their fiduciary responsibilities by accepting bribes and kickbacks from certain vendors, in exchange for purchasing products at inflated prices and ignoring deficiencies in the vendors’ performance. Those vendors were located around the globe, in, among other countries, China, Norway, the United Arab Emirates and the United States.
According to the complaint, Pictet was not a passive banking establishment providing commercial services to the ARPD employees. Rather the bank, through its executive Chambaz, knew of, and affirmatively assisted in, the kickback arrangement between the ARPD employees and the vendors. Chambaz knew the corrupt ARPD employees personally—one for more than 30 years—and knew they were accepting bribes in the course of their employment. He assisted each with setting up a personal account with Pictet in Switzerland and he helped them to create a front company in the British Virgin Islands, TSJ Engineering Consulting Co., Ltd. (TSJ), to receive the bribes from those vendors.[1] Chambaz "actually knew that the substantial sums[,] [well in excess of any ARPD salary,] that *334 were going into, and out of, the TSJ account were not earned by the corrupted employees in the course of their employment with ARPD, or through any legitimate business venture.”
Two causes of action are pleaded as a result: aiding and abetting the employees’ breach of fiduciary duties owed to plaintiffs and civil conspiracy for defendants’ role in establishing TSJ and the corresponding bank accounts that enabled the employees to “launder the funds that flowed from the bribes.”
II.
New York’s long-arm statute provides:
“(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
“1. transacts any business within the state or contracts anywhere to supply goods or services in the state” (CPLR 302 [a] [1]).
The jurisdictional inquiry is twofold: under the first prong, enumerated in subdivision (a) (1), the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, enumerated in subdivision (a), the claims must “arise from” those specific transactions.
The crux of the disagreement is whether the use of the correspondent account in New York by the Swiss bank was purposeful. Understanding the commercial motivation behind correspondent accounts and how they are used by foreign banks is therefore relevant to resolving the issues presented. As one federal court has articulated it:
“Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions. Given the international importance of U.S. currency and the U.S. market, many foreign banks have such interbank accounts in the United States. There are banks that conduct virtually all transac *335 tions external to the bank through their U.S. interbank accounts.
“Because interbank accounts can be used to complete transactions in the United States without the need to directly establish an account in the United States, they can be vehicles for money laundering, with or without the complicity of the foreign bank.” (United States v Union Bank For Sav. & Inv. [Jordan], 487 F3d 8, 15 [1st Cir 2007] [citations omitted]; see generally Correspondent Banking: A Gateway for Money Laundering, a Report by the Minority Staff of the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, 107th Cong, 1st Sess, S Comm Print 107-1 at 11-14, 30, 41-42 [Feb. 2001].)
Here, the complaint alleges that Pictet was complicit in laundering the proceeds of a kickback scheme through its New York correspondent account. These facts fit comfortably within the guideposts established by our two cases on point: Licci (20 NY3d 327) and Amigo Foods Corp. v Marine Midland Bank-N.Y. (39 NY2d 391 [1976]).
Amigo Foods is the leading case finding mere coincidental use of a correspondent account. The facts in Amigo Foods are recounted in the majority and in Licci (majority op at 324; Licci, 20 NY3d at 335-336). It is clear that, as the dissent notes, the defendant bank in Amigo Foods, Aroostook, was the “passive recipient of payment” on a letter of credit in favor of its Maine client. However, the entity directing the payment to Aroostook’s correspondent account at a New York institution was not that client, but a third party: Marine Midland Bank-New York, the buyer’s bank. Aroostook’s entire involvement in that commercial transaction, as later developed through additional discovery, was its receipt of the payment directed by Marine Midland to Aroostook’s New York correspondent account, notification of its client in Maine, and rejection of the funds per the client’s instructions. Marine Midland—the holder of plaintiff’s letter of credit—was taking advantage, for its own convenience, of a banking service provided by Aroostook to deposit funds paid on that letter of credit (Amigo Foods Corp. v Marine Midland Bank-N.Y., 61 AD2d 896 [1st Dept 1978], affd 46 NY2d 855 [1979]; see Licci, 20 NY3d at 337). The “depositor” was not defendant’s client (see dissenting op at 340). *336 Because the plaintiff failed to establish that Aroostook “purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws” (Licci, 20 NY3d at 337, quoting Amigo Foods, 61 AD2d at 897), the analysis ended at prong one of the long-arm test.
In Lied, this Court found such “purposeful availment” with respect to activity conducted through defendant’s correspondent account in New York. We held that
“a foreign bank’s repeated use of a correspondent account in New York on behalf of a client—in effect, a ‘course of dealing’—show[s] purposeful availment of New York’s dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States” (Licci, 20 NY3d at 339 [citation omitted and emphasis supplied]).
The fundamental misimpression apparently left by Lied is that the defendant bank itself must somehow direct the funds into the correspondent bank account (see Rushaid v Pictet & Cie, 127 AD3d 610, 611 [1st Dept 2015] [“Thus, unlike (the defendant bank in Lied), defendants merely carried out their clients’ instructions”]). The dissent takes a quote from a later Second Circuit opinion in Lied: the “bank ‘deliberately chose’ to process the transfers through AmEx in New York” (dissenting op at 343, quoting Licci ex rel. Licci v Lebanese Can. Bank, SAL, 732 F3d 161, 171 [2d Cir 2013]).
Here, there can be no dispute that once the money was in the correspondent account—a time when only Pictet held title to the funds—the bank affirmatively and deliberately transferred the money to Switzerland on behalf of the ARPD employees (see Sigmoil Resources v Pan Ocean Oil Corp. [Nigeria], 234 AD2d 103 [1st Dept 1996]). But the dissent is apparently troubled by the absence of an affirmative act by Pictet in directing the money into the New York correspondent bank account.[2]
The first problem with this line of reasoning is that nowhere in the record of Lied is there any indication that the defend *337 ant, Lebanese Canadian Bank (LCB), itself played a role in choosing to use the New York correspondent account. Rather, as the majority points out, the only evidence in the record is that Hizballah directed the use of that account[3] for deposit of funds ultimately used to further the terrorist goals of that organization. If such facts—the specific nature of the commercial transaction and the bank’s unilateral choice of the corresponding account venue to effect the transfer—truly formed the underpinning of our holding, it is odd to say the least that they are not articulated in our decision. Rather, the relevant allegations were that
“LCB used this correspondent account ... to transfer several million dollars by means of ‘dozens’ of international wire transfers on behalf of Shahid; that LCB knew that Hizballah was a terrorist organization and that Shahid was part of its financial arm; that the wire transfers ‘caused, enabled and facilitated the terrorist rocket attacks’. . . ; and that LCB knew that Hizballah required wire transfer services in order to . . . carry out such terrorist attacks” (Licci, 20 NY3d at 332).
Second, just as the Lebanese bank did in Lied, Pictet provides a correspondent account in this State as a service to its clients. The client here—the same front company established with the help of the bank—used that service approximately 12 times to transfer millions of dollars in U.S. currency to Pictet accounts in Geneva. Funds arrived into the New York correspondent account, at the direction of the front company that the bank helped establish, from those vendors in China, U.A.E., *338 Norway and the United States and were then wire transferred to Pictet accounts in Switzerland in U.S. dollars. Pictet’s actions in clearing these transactions through its New York correspondent account for a client depositing millions of dollars into that Swiss bank was certainly “affirmative and deliberate” and done for the bank’s own commercial purposes. That purposeful activity stands in stark contrast to Aroostook’s passive receipt of a fund transfer from a third party’s bank routed through New York for the sole convenience of that third party (Amigo Foods, 61 AD2d at 897).[4]
Moreover, although much more critical to the analysis of the second prong discussed briefly below, the allegations that Pictet was a knowing participant—as a coconspirator or aider and abettor—in the wrongdoing strongly supports a finding of purposeful availment. Pictet, it is alleged, had a shared purpose with the corrupt ARPD employees—to further the kickback scheme—in the same manner the Lebanese bank in Lied was alleged to have shared Hizballah’s terrorist goals. Use of a correspondent bank account in New York was a deliberate step by clients in both cases to move funds central to these shared goals. In neither case was the úse of a New York correspondent account merely “coincidental.”
Accordingly, the finding that the actions of Pictet satisfy prong one of our test for long-arm jurisdiction is in keeping with both Amigo Foods and Lied and is not in any way a “retreat” from the principles articulated in those cases.[5]
1—i hH hH
As the dissent finds that plaintiff has failed the jurisdictional test on prong one, there is no discussion of the application of the “arising from” prong. “[A]t a minimum,” all that is required is “a relatedness” so that the legal claim is not “completely *339 unmoored” from the transactions (Licci, 20 NY3d at 339). As noted above, plaintiff alleges that Pictet aided and abetted the ARPD employees’ breach of their fiduciary duties to their employer and conspired with them to do the same. Pictet is alleged to have used its New York correspondent account to knowingly transfer the proceeds of the kickback scheme—acting this way to assist the ARPD employees in profiting from their breach of fiduciary duty (see id. at 340). This is sufficient to establish an articulable nexus between the use of the correspondent account and the claims asserted (id. at 339).
IV.
“It should hardly be unforeseeable to a bank that selects and makes use of a particular forum’s banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use” (Licci, 732 F3d at 171-172). The conclusion that personal jurisdiction attaches in a case brought by victims of such wrongs may well chill foreign banks from taking advantage of this State’s banking system to knowingly forward money for terrorist purposes, or to knowingly launder the proceeds of illegal activity. So be it.

. As evidence of Chambaz’s knowledge of the scheme, plaintiffs introduced an email from one of the ARPD employees to Chambaz discussing the name of TSJ, in which the employee requested that Chambaz “add the co. [to the account name] to make it appear to be okay.” The name itself, “TSJ,” stands for the first letter of the first names of the three corrupt employees: Thomas Caplis, Shekhar Shetty, and James Wright, whose names are listed as shareholders on TSJ’s articles of association.

. If this is indeed the missing piece for the dissent, it would seem remand for additional discovery would be in order to determine what role if any Chambaz or others at Pictet played in the routing of funds to New York. Certainly, given the allegations concerning the establishment of the front company in the British Virgin Islands, there is enough to warrant that step. It is certainly as sufficient as the initial showing made by plaintiff in our *337 first Amigo Foods decision—-when we remitted that case to the trial court for further discovery (39 NY2d at 396). While acknowledging that such a request had been made by plaintiff pursuant to CPLR 3211 (d), the lower court denied discovery because it mistakenly believed the argument abandoned, not for any “failure” in the affidavits submitted (2014 NY Slip Op 32286 [U] [2014]; see dissenting op at 343 n 2). Given that jurisdictional issues in long-arm cases are likely to be complex, discovery is “desirable, indeed may be essential, and should quite probably lead to a more accurate judgment than one made solely on the basis of inconclusive preliminary affidavits” (Peterson v Spartan Indus., 33 NY2d 463, 467 [1974]).

. The complaint alleged that the Hizballah accounts were maintained at “various LCB branches in Lebanon” and were “titled to the Shahid (Martyrs) Foundation,” (first amended complaint ¶¶ 45-46, in Licci v American Express Bank Ltd., US Dist Ct, SD NY, No. 08-07253-GBD, available at 2009 WL 3639957).

. If in Lied, LCB had helped Hizballah establish Shahid as a front company, Shahid had then directed donors to deposit funds in the LCB correspondent account in New York, that money was wired from that LCB bank account to a Shahid account at LCB in Lebanon, and it was then dispersed to individuals intending to carry out terrorist attacks—all with a collective purpose to further the terrorist goals of Hizballah—the dissent would find no “purposeful availment” under prong one of our long-arm test.

. As the majority notes, Supreme Court should still address the forum non conveniens issue (majority op at 332). In that context, our State’s interest in the integrity of its banking system may again be considered along with factors militating against resort to a New York forum (see Mashreqbank PSC v Ahmed Hamad Al Gosaibi & Bros. Co., 23 NY3d 129, 137 [2014]).