OPINION OF THE COURT
 

 Smith, J.
 

 The primary issue on this appeal is whether New York law or Russian law should govern the forward currency exchange
 
 *242
 
 transactions entered into between plaintiff Indosuez International Finance B.V. (IIF) and defendant National Reserve Bank (NRB). We hold that New York law applies.
 

 Between 1997 and July 1998, IIF, a Netherlands corporation, and NRB, a Russian bank, entered into 14 nondeliverable forward currency exchange transactions with specified trade dates, settlement dates
 
 [1]
 
 and forward rates. A forward exchange transaction is an obligation to purchase or sell a specific currency on a future date (settlement date) for a fixed price set on the date of the contract (trade date).
 
 [2]
 
 The value of the exchange transactions to IIF and NRB depended on the appreciation or the depreciation of the ruble in relation to the dollar. In the present case, the forward rate is the market-determined exchange rate for exchanging Russian rubles for United States dollars on the settlement date. If on the settlement date, the then-prevailing exchange rate is greater than the forward rate, i.e., if the ruble has depreciated against the dollar, the ruble buyer (NRB) must pay the seller (IIF) in dollars. If, on the other hand, the then-prevailing exchange is less than the forward rate, i.e., the ruble has appreciated, the reverse is true and IIF must pay NRB in dollars.
 

 Seven of the 14 transactions involved payment by IIF to NRB of an “Option Premium.” Unlike the nonoption transactions, in the option transactions, if the ruble appreciated, IIF, the ruble seller, would not have to pay NRB anything on the settlement date because NRB gave up its right to receive a settlement amount in return for the earlier payment of the option premium. IIF made option payments to a New York bank under six of the transactions.
 

 Each of the transactions was evidenced by a confirmation, signed on behalf of NRB by its deputy chairperson of the board. Each of the confirmations provided that it was part of a global agreement consisting of both the terms set forth in the International Swap Dealers Association (ISDA) Master Agreement (the ISDA form) as well as the terms set forth in the confirmations. The confirmations incorporated the terms of the ISDA form and stated that they were governed by the ISDA form except where there was an inconsistency between the two, in which case, the confirmation governed.
 

 
 *243
 
 Ten of the 14 confirmations have New York choice of law provisions, and the remaining four have English law choice of law provisions. At least two of the confirmations required that the affected party be paid through Bank of America, New York. The other confirmations required that the affected party be paid through the bank designated by that affected party. Six of the confirmations contained New York forum selection clauses, and the other eight confirmations either contained no forum selection clause or designated the “courts of England or any other courts of competent jurisdiction.” All of the confirmations indicate that payments were to be made in United States dollars.
 

 In the summer of 1998, the value of the ruble plummeted. The Russian Central Bank stopped supporting the ruble by ceasing to use its foreign currency reserves to purchase rubles. On August 17, 1998, the Russian government and the Central Bank of Russia declared a 90-day moratorium that, among other things, prohibited Russian residents from making payments to nonresidents under forward currency exchange transactions.
 

 Pursuant to the terms of the ISDA form, the moratorium constituted an “Illegality,” allowing IIF to declare an “Early Termination Date” as to the transactions having settlement dates falling during the moratorium period (the affected transactions). IIF gave NRB notice of the affected transactions, statements as to the amounts due and instructions to pay into an account in New York. As each of the successive settlement dates of September 15, October 5, November 16 and December 15, 1998 passed without payment, IIF notified NRB, instructed it as to the amount due and directed it to pay said amounts into an account in New York. NRB made no payments under the forward currency agreements, resulting in a debt of more than $110 million.
 

 IIF brought an action in Supreme Court, alleging breach of the currency exchange agreements. NRB filed an answer, with 11 affirmative defenses. Supreme Court granted partial summary judgment to IIF as to liability. In so deciding, the court construed the confirmations under both New York law and English law and found that NRB was in breach under either law. In addition, Supreme Court found unavailing NRB’s argument that because the confirmations were not executed by NRB’s accountant general, they were null and void under Russian law. The court reasoned that none of the confirmations selected Russian law as the applicable law. The court
 
 *244
 
 also denied NRB’s cross motion to dismiss on its affirmative defenses for insufficiency of service of process, lack of subject matter jurisdiction, lack of personal jurisdiction and unconstitutionality, and referred the matter to a referee for calculation of damages. Supreme Court thereafter accepted the referee’s recommendations on damages and entered judgment. NRB appealed.
 

 The Appellate Division unanimously affirmed, reasoning that while the parties would not be bound by choice of law or forum provisions if the agreements were otherwise invalid, under traditional choice of law principles, New York law was the appropriate law to be applied, as payments were to be made in United States dollars at a New York bank, and New York had a “paramount interest, as an international clearinghouse and market place for a plethora of international transactions denominated in United States dollars, in ensuring orderly dollar currency transactions * * *” (279 AD2d 408, 408-409 [2001] [citations and quotation marks omitted]). The Court additionally found that under New York law, the agreements were valid based on apparent authority and ratification. Finally, the Court found that New York had personal jurisdiction over NRB because New York “bore a rational relationship to the transactions from the outset,” as six of the confirmations made a New York forum selection; in all instances, payments were to be made in New York by virtue of either an express provision or subsequent designation; and, in all instances, payments were to be made in United States dollars on a business day defined as any day on which New York banks were open
 
 (see id.
 
 at 409).
 

 We granted NRB leave to appeal, and we now affirm.
 

 Choice of Law
 

 On this appeal, NRB contends, as it did below, that there is a threshold question of whether the agreements are valid even though they were not signed by the accountant general, who is, according to NRB, the only corporate officer with authority to bind the bank.
 
 [3]
 
 NRB reasons, therefore, that a threshold choice of law analysis must be made as to this agency question. NRB
 
 *245
 
 argues that Russian law should be applied because it is the state with the most significant relationship to the transaction.
 

 New York choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in conflict
 
 (see Zeevi & Sons v Grindlays Bank,
 
 37 NY2d 220, 226-227 [1975],
 
 cert denied
 
 423 US 866 [“(T)he rule which has evolved clearly in our most recent decisions is that the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict” (internal citations and quotations omitted)]; Restatement [Second] of Conflict of Laws § 188 [1]; § 292 [1]).
 

 NRB is a Russian bank with offices in Moscow, and NRB’s agent faxed the confirmations from Russia to IIF in the Netherlands. But New York has the paramount interest because of the nature of the confirmation contracts. We note that parties such as IIF and NRB enter into forward currency exchanges to hedge against their exposure, in the event of a ruble devaluation, on investments in Russian domestic debt or in other investments involving future payments in rubles. Because the essence of the contract is an exchange pegged to the value of the United States dollar, the parties agreed that any payment was to be made in United States dollars. The parties’ choice of New York law in 10 of the 14 confirmations and choice of the New York forum in at least six of the confirmations, reflects their reliance on this state’s experience with and ability to ensure orderly dollar currency transactions. Thus, by virtue of the nature of the transactions and the parties’ own choices, New York has the paramount interest in the enforceability of the transactions.
 

 We now apply this state’s substantive law of agency to the present matter and conclude, as Supreme Court and the Appellate Division did below, that the subject 14 confirmations are binding on and enforceable against NRB, as they were signed by an agent clothed with its principal’s apparent authority. “[T]he existence of ‘apparent authority’ depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading
 
 *246
 
 conduct on the part of the principal — not the agent. * * * Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable * *
 
 (Hallock v State of New York,
 
 64 NY2d at 231 [citations and quotations omitted].) In the present case, each of the 14 confirmations was signed on behalf of NRB by its deputy chairperson of the board on the settlement date. Pursuant to the confirmations, NRB accepted payment into its New York bank account on six of the option transactions. Such conduct alone constitutes an implied representation that the deputy chairperson had authority to bind NRB. Moreover, IIF’s reliance on the validity of the confirmations was reasonable as the chairperson executed five prior confirmations on behalf of NRB with IIF’s parent corporation. In addition, NRB ratified the confirmation contracts as it failed to raise the issue of authority in the course of performance, and it acknowledged its debt to IIF in the letter from NRB’s board chair to IIF’s parent corporation.
 
 [4]
 
 We therefore conclude that the 14 confirmations are valid and enforceable contracts.
 

 Personal Jurisdiction
 

 NRB argues that its contacts with the State of New York do not support this state’s personal jurisdiction over it. Specifically, NRB reasons that the fact that payments were to be made in New York, without more, does not support personal jurisdiction.
 

 NRB, however, maintained a New York bank account for payment of the option payments and the nonoption payments
 
 (see
 
 CPLR 302 [a] [1]). NRB also has the requisite minimum contacts with New York to support the constitutional exercise of personal jurisdiction
 
 (see LaMarca v Pak-Mor Mfg. Co.,
 
 95 NY2d 210, 216 [2000]). Two of the confirmations designate New York as the place of performance because the affected party is to be paid through Bank of America, New York. In ad
 
 *247
 
 dition, seven of the confirmations were optional nondeliverable forward contracts, wherein IIF was to pay an up-front option premium. IIF did so in six of the seven confirmations. Finally, a course of dealing has been established between the parties as payment was made in five prior similar transactions through a New York bank. Such conduct constitutes purposeful exercise by NRB of the privilege of conducting business in New York State sufficient to subject it to personal jurisdiction
 
 (see Banco Ambrosiano v Artoc Bank & Trust,
 
 62 NY2d 65, 71-73 [1984] [finding sufficient contacts to support personal jurisdiction based on foreign defendant’s consent to be paid in United States dollars put into a New York account and on prior routine conduct of exchange deals];
 
 Parex Bank v Russian Sav. Bank,
 
 116 F Supp 2d 415, 422 [SD NY 2000] [same]).
 

 Not only is NRB subject to this state’s jurisdiction because it has the requisite minimum contacts to support jurisdiction, it is also subject to jurisdiction based on the language in the confirmations. Because the 14 confirmations form one global agreement, the six confirmations which made an express New York forum selection are incorporated into each of the remaining eight confirmations. In those six confirmations, NRB expressly submitted to the jurisdiction of this state. Four of the confirmations chose the “courts of England or any other courts of competent jurisdiction.” The remaining four confirmations, which made no forum selection, nevertheless contained the following provision:
 

 “This Confirmation evidences a complete binding agreement between you and us as to the terms of the Transaction. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the 1992 ISDA Master Agreement * * * Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the Master Form (each a ‘Confirmation’) confirming transactions entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to an agreement in the form of the Master Form as if we had executed an agreement in such form on the Trade Date of the first such transaction between us.”
 

 Thus, the four confirmations which made no express forum
 
 *248
 
 selection are part of a global agreement between the parties, which agreement includes the express submission to New York jurisdiction contained in the majority of the confirmations.
 

 Subject Matter Jurisdiction
 

 Finally, NRB argues that the courts of this state lack subject matter jurisdiction over the claims because Banking Law § 200-b, which grants subject matter jurisdiction over claims by foreign parties, does so only “where the action is brought to recover damages for the breach of a contract made or to be performed within this state.” (§ 200-b [2] [a].) NRB reasons that only two of the confirmations actually designated New York as the place of performance and the other 12 merely provided that IIF may designate where the contract is to be performed. NRB emphasizes that IIF made the designation after the confirmations were signed.
 

 Subject matter jurisdiction under Banking Law § 200-b extends to claims where a party chooses New York for the place of performance even after the contract is formed
 
 (see Hanil Bank v PT. Bank Negara Indonesia [Persero],
 
 148 F3d 127 [2d Cir 1998];
 
 A.I. Credit Corp. v Liebman,
 
 791 F Supp 427 [SD NY 1992]).
 

 • Thus, IIF has established its claim of breach of contract under New York law, and NRB has failed to demonstrate that Russian law prevents recovery.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . In the case of swap transactions, the term “Termination Date” or “Maturity Date” is used instead of settlement date.
 

 [2]
 

 .
 
 See generally
 
 Rosenberg, Dictionary of Banking 153 (1993).
 

 [3]
 

 . Both Supreme Court and the Appellate Division resolved the conflict of laws question, without addressing an issue now put before us by IIF, that no conflict existed at all. We note that IIF argues persuasively before us that even if this Court assumes that article 7 of the Law of Accounting of the Russian Federation defines which agent has authority to bind the corporation, NRB has established only that as a matter of law, NRB’s agent, who was the deputy chairperson of the board, and not the chief accountant, did not have
 
 *245
 
 actual authority to bind the corporation. Thus, IIF argues that NRB has failed to establish that as a matter of Russian law, principles of apparent authority similar to the law of New York
 
 (see Hallock v State of New York,
 
 64 NY2d 224, 231 [1984]) do not exist, such that NRB may not be bound on a theory of apparent authority.
 

 [4]
 

 ,, In a letter dated January 27, 1999, from A.E. Lebedev, Chairman of the Board of NRB to Lucien Douroux, Chairman of IIF’s parent company (Credit Agricole Indosuez), NRB wrote:
 

 “We are currently negotiating the settlement of certain swaps and derivatives [sic] transactions between Indosuez International Finance, Geneva Branch and ourselves * * * National Reserve Bank * * * has enjoyed a good business relationship with the Credit Agricole Indosuez group. As part of this relationship, National Reserve Bank entered into certain swaps and derivatives [sic] transactions with Indosuez International Finance, Geneva Branch * * * [W]e recognize the need to reach an agreement with your Bank in respect of our outstanding obligations * * *.”