This opinion is uncorrected and subject to revision before publication in the New York Reports.
-----------------------------------------------------------------

No. 180
Rasheed Al Rushaid, et al.,
          Appellants,
        v.
Pictet & Cie, et al.,
          Respondents.

              Gary P. Naftalis, for appellants.
              Maeve L. O'Connor, for respondents.

RIVERA, J.:

          Plaintiffs challenge the dismissal of their claims for lack of personal jurisdiction, alleging defendants' business activities bring them within the reach of New York's long-arm statute.  We conclude that defendants' intentional and repeated use of New York correspondent bank accounts to launder their customers' illegally obtained funds constitutes purposeful transaction of business substantially related to plaintiffs' claims, thus conferring personal jurisdiction within the meaning

- 1 -

of CPLR 302(a)(1).  Accordingly, the Appellate Division order should be reversed and the matter remitted to Supreme Court for consideration of defendants' alternative grounds for dismissal of the amended complaint.

## I. Background

Plaintiff Rasheed Al Rushaid is a Saudi resident and co-owner of plaintiff Al Rushaid Petroleum Investment Corporation (ARPIC), a company organized under the laws of Saudi Arabia and the owner of another Saudi company, plaintiff Al Rushaid Parker Drilling, Ltd. (ARPD).  Defendants are Pictet & Cie (Pictet), a private bank with its principal place of business in Geneva, Switzerland, Vice President and Client Relationship Manager Pierre-Alain Chambaz and Pictet's eight general partners.[1] Plaintiffs sued defendants in New York state court for concealing ill-gotten money from a scheme orchestrated by three of plaintiffs' employees.

As alleged in the first amended complaint, ARPD contracted to build six oil rigs for Saudi Arabia's national oil company.  Unbeknownst to the plaintiffs, three ARPD employees responsible for procuring services and vendors for the project breached their fiduciary responsibilities by accepting bribes and

---

[1]The general partner defendants are Philippe Bertherat, Remy Antoine Best, Renaud Fernand de Planta, Jacques Joseph de Saussure, Bertrand Francois Lambert Demole, Jean-Francois Demole, Marc Philippe Pictet, and Nicolas Lucien Pictet.

kickbacks from certain vendors, in exchange for purchasing products at inflated prices and ignoring deficiencies in the vendors' services.[2]

Defendants played a central role in the employees' scheme by knowingly laundering and concealing the bribes and kickbacks for approximately four years.  According to the amended complaint, "the corrupted employees needed the help of a willing banker, a role fulfilled by defendants Pictet and Chambaz." Specifically, Chambaz set up an offshore "bogus" company to receive the bribes -- TSJ Engineering Consulting Co., Ltd. (TSJ) in the British Virgin Islands.  He opened and actively managed Geneva-based Pictet bank accounts for TSJ and the individual employees.  The bank orchestrated the laundering of funds from the vendors who wired bribes in favor of "Pictet and Co. Bankers Geneva" to Pictet's New York correspondent bank account.[3]  From

---

[2]Plaintiffs alleged that once they discovered the bribes they commenced an action in Switzerland, through which they successfully froze TSJ's and the employees' Pictet accounts. Also, the employees were indicted in Switzerland for money laundering.

[3]The complaint alleges that Chambaz and Pictet knew the money was "the result of some breach of the corrupted employees' duties," "provide[d] substantial help," "hid" millions of dollars in kickbacks, set up "a 'bogus' company to receive the bribes," "also set up and managed Pictet bank accounts that were used by the corrupted employees to launder and conceal the bribe money," knew that TSJ would be used to launder money, and "helped the corrupted employees open bank accounts" that would be used to receive the laundered money, all in violation of their own fiduciary duties.  Thus, contrary to the dissent's assertion (dissenting op at 6), the plaintiffs allege that Pictet and

there, the funds were credited by Pictet to TSJ's Geneva-based account, and the money was later divided up and transferred to the employees' individual accounts.

Plaintiffs alleged that "Pictet and Chambaz valued their cozy business relationship with the corrupted employees more than they valued proper banking procedures or ensuring that it complied with its own financial responsibilities." As described in the amended complaint, Chambaz was no innocent banker. He was friends with the employees, and one of them -- a friend for over 30 years -- emailed Chambaz about TSJ's name and requested that Chambaz "add the co. to make it appear to be okay." Chambaz also knew the employees' annual income and that they worked full time as officers or directors for ARPD. Thus, he had information that the money being deposited vastly exceeded the employees' pay and was the result of some breach of their duties, but he continued to help the employees conceal the scheme.

Plaintiffs asserted that defendants aided and abetted the employees' breach of their fiduciary duty and were part of a civil conspiracy with the employees. Plaintiffs sought over $350 million in damages for harm incurred as a result of the bribery and kickback scheme and the consequent financial devastation of their business.

Defendants moved to dismiss the amended complaint under

Chambaz designed and orchestrated the scheme.

CPLR 3211 (a) for lack of personal jurisdiction and failure to state a claim, and pursuant to CPLR 327 on the basis of forum non conveniens. Defendants also moved to dismiss as against Al Rushaid and ARPIC for lack of standing under CPLR 3211 (a)(2).

In opposition to the motion, plaintiffs submitted copies of TSJ's Articles of Incorporation and other corporate documents listing the employees as owners and sole shareholders, and applications for TSJ's and the employees' Pictet bank accounts. Plaintiffs also submitted copies of documents tracing wire transfers from the vendors to Pictet's five New York correspondent accounts, which the complaint alleged were credited to TSJ's and the employees' Pictet Geneva accounts. The documents provide a record of invoices directing payment to Pictet's Citibank account in New York, "credit advice" documents reflecting payment to that same account, and routing documents tracing transfers again through that same New York account. Plaintiffs also submitted similar documents evidencing receipts from and transfers to various other Pictet accounts in New York including HSBC Bank USA, N.A., Deutsche Bank Trust Company, America, and JPMorgan Chase Bank N.A. In sum, the documents represented numerous transfers, 15 of which were to/from Citibank, New York and totaled over $4 million.

Supreme Court granted defendants' motion to dismiss for lack of personal jurisdiction, concluding that defendants' use of the correspondent accounts was passive not purposeful (2014 WL

4226466 [Sup Ct, NY County 2014]).  The court also denied
jurisdictional discovery based on a statement by plaintiffs'
counsel at oral argument that the request was their fallback
argument.  In light of its decision, the court did not address
defendants' alternative grounds for dismissal.

Plaintiffs appealed, arguing that personal jurisdiction
existed under the reasoning of Licci v Lebanese Can. Bank, SAL
(20 NY3d 327 [2012]).  The Appellate Division affirmed, and
distinguished Licci as requiring deliberate acts which were
absent in plaintiffs' case because the defendants merely carried
out their clients' instructions and did not "purposefully avail[]
[themselves] of the privilege of conducting activities in New
York" (127 AD3d 610, 611 [1st Dept 2015]).  We granted leave to
appeal (26 NY3d 909).

## II. New York's Long-Arm Statute CPLR 302 (a)(1)

Plaintiffs allege that Pictet's repeated use of New
York correspondent accounts to receive and transfer millions of
dollars in illicit funds was central to the kickback and bribery
scheme, and constitutes the transaction of business substantially
related to their claims against defendants sufficient to confer
personal jurisdiction under CPLR 302 (a)(1).  Defendants respond
that personal jurisdiction cannot depend on third party conduct,
and requires a type of purposeful availment by defendants that is
lacking here.  Defendants also counter that the bank deposits are

incidental to the claimed wrongdoing because the basis for the
lawsuit is defendants' role in conspiring and aiding and abetting
the concealment of the bribes, not the manner in which the funds
were allegedly concealed.

We conclude that defendants' use of the correspondent
bank accounts was purposeful and that plaintiffs' aiding and
abetting and conspiracy claims arise from these transactions.
Our decision is in accord with the analysis in Licci, that the
requirements of CPLR 302 (a)(1) are satisfied where the quantity
and quality of contacts establish a "course of dealing" with New
York, and the transaction and claim are not "merely coincidental"
(see Licci, 20 NY3d at 340).

A.  Transacting Business in New York Through a Correspondent
Account

CPLR 302 (a)(1) of New York's long arm statute
provides, in relevant part,

> As to a cause of action arising from any of
> the acts enumerated in this section, a court
> may exercise personal jurisdiction over any
> non-domiciliary, or his executor or
> administrator, who in person or through an
> agent . . . transacts any business within the
> state or contracts anywhere to supply goods
> or services in the state.

The CPLR 302 (a)(1) jurisdictional inquiry is twofold:  under the
first prong the defendant must have conducted sufficient
activities to have transacted business in state, and under the

second prong, the claims must arise from the transactions.[4]
Thus, "jurisdiction is proper even though the defendant never
enters New York, so long as the defendant's activities here were
purposeful and there is a substantial relationship between the
transaction and the claim asserted" (Fischbarg v Doucet, 9 NY3D
375, 380 [2007]).

The Court has explained that "[p]urposeful activities
are those with which a defendant through volitional acts, avails
itself of the privilege of conducting activities within the forum
State, thus invoking the benefits and protections of its laws"
(id. [internal citations omitted]).  Determining "'purposeful
availment' is an objective inquiry, [which] always requires a
court to closely examine the defendant's contacts for their
quality" (Licci, 20 NY3d at 338, citing Fischbarg, 9 NY3d at
380).

In Amigo Foods Corp. v Marine Midland Bank-NY (39 NY2d
391 [1976]), the Court considered whether a non-domiciliary's use
of a New York-based correspondent bank provides a jurisdictional
basis under CPLR 302 (a)(1).  In that case, plaintiff Amigo Foods

---

[4]Notably, "[t]he transacting-business requirement of N.Y.
C.P.L.R. 302 requires far fewer contacts with New York than does
the doing-business requirement of N.Y. C.P.L.R. 301. Indeed,
proof of one transaction in New York is sufficient to invoke
jurisdiction. This easing of requirements is offset by the
corresponding requirement that the cause of action arise from the
very transaction or transactions which are relied upon to provide
the contact with the forum" (15 NY Jur. 2d Business Relationships
§ 1159).

Corporation, a New York wholesaler, contracted to buy potatoes from a Maine potato grower.  Payment was to be made by letter of credit at or through defendant Aroostook Trust Company, a bank located in Maine.  Amigo Foods obtained the letter of credit from New York-based Marine Midland Bank, which delivered the letter to Aroostook's New York correspondent bank, Irving Trust Company. The parties disputed the nature of the relationship between Aroostook and Irving Trust, and relied on competing legal theories as to whether Irving Trust was an agent or an independent contractor of Aroostook.  On appeal from dismissal of the complaint for lack of jurisdiction, this Court reversed and remanded for jurisdictional discovery, concluding that Aroostook's involvement needed to be clarified because, "standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302 (subd. (a), par. 1)" (39 NY2d at 396).

On remand, discovery revealed that Amigo Foods directed Marine Midland Bank to wire funds to the wholesaler's account with Aroostook.  Marine Midland unilaterally chose to wire payment through the "relatively small checking account" defendant maintained at Irving Trust.  When Aroostook informed the Maine potato grower of this transaction, the potato grower instructed Aroostook to reject the funds, which it did.  The Appellate Division dismissed for lack of jurisdiction because Aroostook,

through its New York correspondent account, had "passively and unilaterally been made the recipient of funds" (61 AD2d 896 [1st Dept 1978]). We affirmed for the reasons stated (46 NY2d 855 [1979]).

Years later the Court revisited the issue of correspondent accounts as a basis for personal jurisdiction in Licci. In that case the Second Circuit certified two questions regarding the application of CPLR 302 (a)(1) to a foreign bank charged with violations of the Anti-Terrorism Act, Alien Tort Statute, and Israeli tort law. In Licci, several dozen United States, Canadian, and Israeli citizens were injured by terrorist attacks in Israel launched by Hizballah. The plaintiffs sued Lebanese Canadian Bank (LCB) for facilitating terrorist acts by providing banking services to Hizballah. Personal jurisdiction in New York was alleged based on LCB's use of a New York correspondent bank account to effectuate the wire transfers that provided the funds to Hizballah's "financial arm," the Shahid Foundation, necessary to the commission of the illegal attacks.

In addressing the certified questions, our Court stated that "in the banking context, the requisite inquiry under CPLR 302 (a)(1)'s first prong [the transacting business requirement] may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to

New York, or indeed the United States" (20 NY3d at 338).  To

clarify, the Court relied on Amigo Foods as an example of

activity that cannot serve as a basis for personal jurisdiction

because Aroostook's use of the correspondent account "was

essentially adventitious -- i.e., it was not even Aroostook's

doing" (Licci, 20 NY3d at 338).  This Court did not reason,

contrary to the dissent's suggestion (dissenting op at 3), that

personal jurisdiction arising from the use of a correspondent

bank account in New York must also be accompanied by additional

activities in the state.  Instead, Licci held that "complaints

alleging a foreign bank's repeated use of a correspondent account

in New York on behalf of a client -- in effect, a 'course of

dealing'[] -- show purposeful availment of New York's dependable

and transparent banking system, the dollar as a stable and

fungible currency, and the predictable jurisdictional and

commercial law of New York and the United States" (Licci, 20 NY3d

at 339, citing Indosuez Intl. Fin. v National Reserve, 98 NY2d

238, 247 [2002]).

        The case cited by the Court in support of this "course

of dealing" formulation, Indosuez Intl. Fin. v National Reserve

Bank (98 NY2d 238 [2002]), involved 14 currency exchange

transactions between a Netherlands corporation and a Russian

bank, six of which were made by the plaintiff to a New York bank

and ten of which had New York choice of law provisions.  Personal

jurisdiction existed because the parties had established payment

in five prior similar transactions through a New York bank, by
which "a course of dealing ha[d] been established" (98 NY2d at
247; citing Banco Ambrosiano v Artoc Bank & Trust, 62 NY2d 65
[1984] [finding sufficient contacts to maintain jurisdiction
where defendant maintained a correspondent bank account in New
York, the account was "the very account through which" the
transaction at issue was effectuated, and the defendant
"regularly" used the account to "accomplish its international
banking business"];[5] and Parex Bank v Russian Sav. Bank, 116 F
Supp 2d 415 [SDNY 2000][finding a Russian company "does business"
in New York where it "routinely" conducted exchange deals and
agreed to accept payment and a security deposit using New York
banks and banking institutions]).

Given this understanding of the first prong of CPLR 302

---

[5]The dissent's apparent concern over our reference to these
cases is misplaced.  The Court in Licci cites both Indosuez
(Licci, 20 NY3d at 339) and Banco Ambrosiano (id. at 335) to
support its analysis of when the use of a correspondent account
rises to the level of a "course of dealing."  Further, the
dissent incorrectly insists that Indosuez is inapplicable because
jurisdiction hinged on the New York forum selection clauses and
the fact that the bank was itself a party to the contract.  The
forum selection clauses were only an alternative ground for
jurisdiction, not a necessary component of it (Indosuez, 98 NY2d
at 247).  Additionally, it is true that the bank was a party to
the contracts at issue, but nowhere does the Court rely on this
fact in its personal jurisdiction analysis.  The dissent's
attempt to distinguish Banco Ambrosiano is similarly
unpersuasive.  Not only did Indosuez cite Banco Ambrosiano in the
context of defining a course of dealing, but Licci also cited
Banco Ambrosiano as an example of this Court's consideration of
when a party may be subject to jurisdiction based on the use of a
correspondent bank account, albeit in a different context.

(a)(1), the Court in Licci concluded that the repeated use by LCB of the correspondent account showed a transaction of business where LCB "deliberately used a New York account again and again" and "presumably" LCB used this New York account because it was "cheaper and easier for LCB than other options."  Thus, even though "LCB could have routed the dollar transactions on behalf of Shahid elsewhere, the fact that LCB used a New York account 'dozens' of times indicates desirability and a lack of coincidence" (20 NY3d at 340).

As these cases establish, unintended and unapproved use of a correspondent bank account, where the non-domiciliary bank is a passive and unilateral recipient of funds later rejected -- as in Amigo Foods -- does not constitute purposeful availment for personal jurisdiction under CPLR 302 (a)(1).  Repeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer -- as in Licci -- demonstrates volitional activity constituting transaction of business.  In other words, the quantity and quality of a foreign bank's contacts with the correspondent bank must demonstrate more than banking by happenstance.

Turning to plaintiffs' appeal, we first assume as true the facts alleged in the amended complaint because, "[o]n a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction. We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every

possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]).  The Court may "consider affidavits submitted by plaintiffs to remedy any defects in the complaint, because the question is whether plaintiffs have a cause of action, not whether they have properly labeled or artfully stated one" (Chanko v American Broad. Co. Inc., 27 NY3d 46, 52 [2016]).

The amended complaint asserts that Pictet maintained a relationship with New York banks and marketed "business relations in New York" on its website.  Specifically, the Citibank, New York account was used to wire the bribes to a Pictet account in Geneva, after which point, the money was divided up and distributed amongst the "corrupted employees" by deposit to their individual Pictet accounts.  Chambaz knew the large sums of money being wired were proceeds of an illegal scheme but never questioned them, and continued to aid and abet the fraud.  In opposition to the motion to dismiss, plaintiffs submitted copies documenting 15 wire transfers to Citibank in favor of TSJ, from 2006-2008, which reveal the movement of millions of dollars from the vendors to the employees.  Similar transactions were documented from several other of Pictet's New York correspondent accounts.

After the vendors sent the money to Citibank, Pictet did not ignore or reject the funds, as the defendant did in Amigo

Foods (39 NY2d 391).  Rather, Pictet credited the funds in that
correspondent bank account to TSJ, an essential step in the
money-laundering scheme.  Citibank and the other banks held funds
for Pictet, then Pictet credited them to the TSJ account, and
next distributed the funds to the employee accounts.  It is of no
moment that the employees "directed the vendors" to deposit the
money in the New York accounts because what matters is
defendants' banking activity with the correspondent accounts,
here, that the money deposited in New York was credited to the
Pictet accounts in accordance with Pictet's money-laundering.  As
described in the complaint, the employees accessed the funds in
those accounts after Pictet credited the transfer from its New
York correspondent account.

The Appellate Division erroneously concluded that
plaintiffs failed to establish purposeful availment because
defendants "merely carried out their clients' instructions."  Our
cases do not require that the foreign bank itself direct the
deposits, only that the bank affirmatively act on them.  Contrary
to the dissent's assertion (dissenting op at 4), in Licci, it was
Hizbollah that directed the wire transfers through LCB's
correspondent bank and not defendant, LCB.  A foreign bank with a
correspondent account, therefore, that repeatedly approves
deposits and the movement of funds through that account for the
benefit of its customer is no less "transacting business in New
York" because the customer, or a third party at the customer's

direction, actually deposits or transfers the funds to New York.

Moreover, the jurisdictional inquiry at the first prong requires a close examination of defendant's contacts (Licci, 20 NY3d at 338).  If those contacts are enough, the fact that others may also have contact with the correspondent bank is not dispositive.  The facts here illustrate the point because the complaint alleges that defendants orchestrated the money laundering and that the New York account was integral to the scheme.  It is precisely the fact that defendants chose New York, when other jurisdictions were available, that makes the New York connection "volitional" and not "coincidental."  The focus of the jurisdictional analysis is the foreign bank's conduct vis-a-vis the correspondent bank, meaning how it uses the correspondent accounts -- not whether some other bank could have been used instead.

Defendants' use of the correspondent accounts is far from the "unilateral" payment in Amigo Foods where plaintiffs chose to deposit money in New York at their own discretion because here the vendors' choice to deposit money in New York was precisely part of defendants' design, and not a "unilateral" decision at all.  Pictet was therefore actively engaged in a cycle of banking transactions wherein money went from the vendors to New York to Geneva, and then from Geneva to the employees. The use of the account was not "adventitious" because the account was used routinely to hold deposits which Pictet then credited to

TSJ's account in Geneva.  Thus, the correspondent account was crucial to a course of repeated banking activity.

Defendants' conduct is like that found sufficient in Licci, where the defendants actively used a correspondent bank to further a scheme that caused harm.  As in Licci, the defendants' use of the New York account to transfer money provided the employees with the "laundered" profits from the bribery and kickback scheme.  Also, just as in Licci, defendants used the correspondent account in New York "to move the necessary" money (Licci, 20 NY3d at 340).

Defendants' correspondent banking activity is sufficient to establish a purposeful course of dealing, constituting the transaction of business in New York under CPLR 302 (a)(1).


   B.  Cause of Action Arising from the Contacts with New York

To satisfy the second prong of CPLR 302 (a)(1) that the cause of action arise from the contacts with New York, there must be an "'articulable nexus' [] or 'substantial relationship' [] between the business transaction and the claim asserted" (Licci, 20 NY3d at 339).  This inquiry is "relatively permissive" (id. at 339, citing McGowan v Smith, 52 NY2d 268 [1981] and Kreutter v McFadden Oil Corp., 71 NY2d 460 [1988]), and does not require causation, but merely "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored

from the former, regardless of the ultimate merits of the claim" (Licci, 20 NY3d at 339).  The claim need only be "in some way arguably connected to the transaction" (id. at 340).

The allegations in the complaint easily satisfy this nexus requirement.  Plaintiffs allege that defendants aided and abetted in the employees' breach of their fiduciary duty to the plaintiffs, and defendants further conspired with each other and the employees by acting in concert to breach fiduciary duties, defraud plaintiffs, and convert plaintiffs' property.  These claims depend on the assertions that defendants established the banking structure in New York and Geneva through which they orchestrated the money laundering part of the bribery/kickback scheme.  Defendants served as the employees' bankers, without whom the employees could not launder and conceal millions in kickbacks and bribes.  In Licci, the Court found the requisite nexus where the bank effected wire transfers which financed terrorist activities.  Similarly, the complaint alleges that Pictet and defendants effected the transfers of money to the New York correspondent bank as part of the money-laundering scheme that put the bribes/kickbacks in the hands of the employees. Those allegations are enough to show the minimum level of relatedness to the Citibank transactions.

Defendants argue that the use of the New York correspondent bank is not substantially related to the allegations because the transfers occurred months after TSJ and

the individual Pictet bank accounts were created, and therefore the transfers were incidental to the scheme that injured the plaintiffs, since the injury would exist had payment been made by means other than wire transfers. Defendants mistakenly rely on Johnson v Ward (4 NY3d 516 [2005]) in support of their argument that the New York connection was "merely coincidental." In Johnson, a non-resident driver, with a New York state license and registration, got into a car accident from which a tort claim arose. The accident occurred in New Jersey and all the parties were New Jersey residents. The Court reasoned that the possession of a New York license and registration at the time of the accident was "merely coincidental" because the claim arose out of the allegedly negligent driving, not the issuance of a New York license and registration. The defendant driver could have had a license from elsewhere or no license at all.

Here, the money laundering could not proceed without the use of the correspondent bank account, and, as plaintiffs argue, their claims require proof that the bribes and kickbacks were in fact paid. The money laundering scheme Chambaz designed relied precisely on the existence of bank accounts in different jurisdictions, through which the money would pass. In Johnson, the claim of negligence was wholly separate from defendant's possession of a New York state license and registration. In contrast, plaintiffs' claims of aiding and abetting breaches of fiduciary duties and conspiracy turn entirely on the money

laundering Pictet and Chambaz allegedly set up and maintained, necessarily including the use of a New York bank account.

### III. Federal Constitutional Due Process

Exercise of personal jurisdiction under the long-arm statute must comport with federal constitutional due process requirements (LaMarca V Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000]).  It is well established that a nondomiciliary must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" (International Shoe Co. v State of Wash., Office of Unemployment Comp. & Placement, 326 US 310, 316 [1945] [internal quotation marks and citations omitted]).  As the Second Circuit has aptly noted, "despite the fact that section 302 (a)(1) . . . and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare" (Licci ex rel. Licci v Lebanese Can. Bank, SAL, 732 F3d 161, 170 [2d Cir 2013]).  This is not such a case, and defendants' arguments to the contrary are meritless.

The "minimum contacts" test "has come to rest on whether a defendant's conduct and connection with the forum State are such that it should reasonably anticipate being haled into court there" (LaMarca, 95 NY2d at 216 [citations omitted]).  Such

minimum contacts exist where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State" (id.).  Here, defendants' maintenance and repeated use of a New York correspondent bank account "to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry" (Licci ex rel. Licci, 732 F3d at 173).

Whether personal jurisdiction offends "notions of fair play and substantial justice" depends on a consideration of "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies" (Burger King Corp. v Rudzewicz, 471 US 462, 477 [1985]).  Here, while the parties are foreign nationals, the burden of litigation in New York is reduced by "modern communication and transportation" (Licci ex rel. Licci, 732 F3d  at 174 [citations omitted]).  Furthermore, the complaint implicates the fraudulent use of New York's banking system, an issue of great importance to the State, and New York courts provide the plaintiffs a greater possibility of relief.  On balance, and considering all the remaining factors, the maintenance of suit here does not "offend traditional notions of fair play and substantial justice."

## IV. Forum Non Conveniens

Defendants advance another alternative argument, that we should dismiss the complaint on forum non conveniens grounds as a matter of law.  We find no support for this position.  "In general, a decision to grant or deny a motion to dismiss []on forum non conveniens grounds is addressed to a court's discretion, and we will review it only to decide whether discretion has been abused" (Mashreqbank PSC v Ahmed Hamad Al Gosaibi & Bros. Co., 23 NY3d 129, 137-38 [2014]).  Such cases, where forum non conveniens grounds is required as a matter of law, are "relatively uncommon" (id.).  "The doctrine is flexible, requiring the balancing of many factors in light of the facts and circumstances of the particular case" (National Bank & Trust Co. of N. Am. v Banco De Vizcaya, S.A., 72 NY2d 1005, 1007 [1988]).  The instant appeal is a poor candidate for forum non conveniens disposition in this Court because there has been no discovery and plaintiffs allege the existence of additional contacts that may affect the balance of factors in favor of maintaining jurisdiction over the case.  Instead, Supreme Court should address the matter in the first instance.

## V.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

Rasheed al Rushaid, et al. v Pictet & Cie, et al.

No. 180

GARCIA, J. (concurring):

This case calls upon us to again examine when the use of a New York correspondent bank account by a foreign bank is sufficient to confer personal jurisdiction over that foreign bank under this State's long-arm statute.

- 1 -

The majority and dissent disagree on whether the conduct of defendant here, a Swiss bank, was sufficient to satisfy the first prong of our long-arm test -- the transaction of business within the State.  I agree with the majority that defendant's conduct was sufficient to confer personal jurisdiction.  However, given the dissent's dire warning that we "risk[] upending forty years of precedent" (dissenting op at 1), I write separately simply to make clear we do no such thing.

I.

The substance of plaintiff's allegations are not in dispute.  Nor is the rule requiring us to accept those allegations as true in deciding the issue of personal jurisdiction (see Licci v Lebanese Canadian Bank, 20 NY3d 327, 340 [2012]).

Plaintiff Rasheed Al Rushaid is a Saudi resident and co-owner of plaintiff Al Rushaid Petroleum Investment Corporation, a Saudi company that in turn owns plaintiff Al Rushaid Parker Drilling, Ltd. (ARPD).  Defendants are Pictet & Cie (Pictet), a private bank with its principal place of business in Geneva, Switzerland, Vice President and Client Relationship Manager Pierre-Alain Chambaz and Pictet's eight general partners.

Plaintiffs commenced this action in New York state court asserting that defendants were active participants in a kickback and money-laundering scheme orchestrated by three of ARPD's employees.

ARPD contracted to build six oil rigs for Saudi Arabia's national oil company.  Three ARPD employees responsible for procuring services and vendors for the project allegedly breached their fiduciary responsibilities by accepting bribes and kickbacks from certain vendors, in exchange for purchasing products at inflated prices and ignoring deficiencies in the vendors' performance.  Those vendors were located around the globe, in, among other countries, China, Norway, the United Arab Emirates and the United States.

According to the complaint, Pictet was not a passive banking establishment providing commercial services to the ARPD employees.  Rather the bank, through its executive Chambaz, knew of, and affirmatively assisted in, the kickback arrangement between the ARPD employees and the vendors.  Chambaz knew the corrupt ARPD employees personally -- one for more than thirty years -- and knew they were accepting bribes in the course of their employment.  He assisted each with setting up a personal account with Pictet in Switzerland and he helped them to create a front company in the British Virgin Islands, TSJ Engineering Consulting Co., Ltd. [TSJ], to receive the bribes from those vendors.[1]  Chambaz "actually knew that substantial sums, well in

---

[1] As evidence of Chambaz's knowledge of the scheme, plaintiff's introduced an email from one of the ARPD employees to Chambaz discussing the name of TSJ, in which the employee requested that Chambaz "add the co. [to the account name] to make it appear to be okay." The name itself, "TSJ," stands for the first letter of the first names of the three corrupt employees:

excess [of any ARPD salary], were going into, and out of, the TSJ account were not earned by the corrupted employees in the course of their employment with ARPD, or through any legitimate business venture."

Two causes of action are pleaded as a result: aiding and abetting the employees' breach of fiduciary duties owed to plaintiffs' and civil conspiracy for defendants' role in establishing TSJ and the corresponding bank accounts that enabled the employees to "launder the funds that flowed from the bribes."

## II.

New York's long-arm statute provides:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state.

(CPLR 302 [a][1]).

The jurisdictional inquiry is twofold:  under the first prong, enumerated in subsection (a)(1), the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, enumerated in subsection (a), the claims must "arise from" those specific transactions.

Thomas Caplis, Shekhar Shetty, and James Wright, whose names are listed as shareholders on TSJ's Articles of Association.

        The crux of the disagreement is whether the use of the correspondent account in New York by the Swiss bank was purposeful.  Understanding the commercial motivation behind correspondent accounts and how they are used by foreign banks is therefore relevant to resolving the issues presented.  As one federal court has articulated it:

> Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions. Given the international importance of U.S. currency and the U.S. market, many foreign banks have such interbank accounts in the United States. There are banks that conduct virtually all transactions external to the bank through their U.S. interbank accounts.
>
> Because interbank accounts can be used to complete transactions in the United States without the need to directly establish an account in the United States, they can be vehicles for money laundering, with or without the complicity of the foreign bank.

(United States v. Union Bank for Savings & Investment (Jordan), 487 F3d 8, 15 [1st Cir 2007] [internal citations omitted]; see generally Minority Staff of Senate Permanent Subcomm. on Investigations, 107th Cong., Report on Correspondent Banking: A Gateway to Money Laundering, 11-14, 30, 41-42 [Comm. Print 2001]).

        Here, the complaint alleges that Pictet was complicit in laundering the proceeds of a kickback scheme through its New York correspondent account.  These facts fit comfortably within

the guideposts established by our two cases on point: <u>Licci</u> (20 NY3d 327) and <u>Amigo Foods Corp. v Marine Midland Bank-New York et al.</u> (39 NY2d 391 [1976]).

Amigo Foods is the leading case finding mere coincidental use of a correspondent account.  The facts in <u>Amigo Foods</u> are recounted in the majority and in <u>Licci</u> (majority op at 8-9; <u>Licci</u>, 20 NY3d at 335-336).  It is clear that, as the dissent notes, the defendant bank in <u>Amigo Foods</u>, Aroostook, was the "passive recipient of payment" on a letter of credit in favor of its Maine client.  However, the entity directing the payment to Aroostook's correspondent account at a New York institution was not that client, but a third-party: Marine Midland Bank-New York, the buyer's bank.  Aroostook's entire involvement in that commercial transaction, as later developed through additional discovery, was its receipt of the payment directed by Marine Midland to Aroostook's New York correspondent account, notification of its client in Maine, and rejection of the funds per the client's instructions. Marine Midland -- the holder of plaintiff's letter of credit -- was taking advantage, for its own convenience, of a banking service provided by Aroostook to deposit funds paid on that letter of credit (<u>Amigo Foods Corp. v Marine Midland Bank-New York et al.</u>, 61 AD2d 896 [1st Dept 1978] <u>affd</u> 46 NY2d 855 [1979]; <u>see</u> <u>Licci</u>, 20 NY3d at 337).  The "depositor" was not defendant's client  (<u>see</u> dissenting op at 3).  Because the plaintiff failed to establish that Aroostook

"purposefully availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws" (Licci, 20 NY3d at 337, quoting Amigo Foods, 61 AD2d at 897), the analysis ended at prong one of the long-arm test.

In Licci, this Court found such "purposeful availment" with respect to activity conducted through defendant's correspondent account in New York.  We held that "a foreign bank's repeated use of a correspondent account in New York *on behalf of a client* -- in effect, a 'course of dealing' -- shows purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States"  (Licci, 20 NY3d at 339 [internal citation omitted][emphasis supplied]).  The fundamental misimpression apparently left by Licci is that the defendant bank itself must somehow direct the funds into the correspondent bank account (see Rasheed Al Rushaid et al. v Pictet, 127 AD3d 610 [1st Dept 2015]["Thus, unlike (the defendant bank in Licci), defendants merely carried out their clients' instructions"]). The dissent takes a quote from a later Second Circuit opinion in Licci; the "bank 'deliberately chose' to process the transfers through AmEx in New York" (dissenting op at 7, quoting Licci ex rel. Licci et al. v Lebanese Canadian Bank, SAL, 732 F3d 161, 171 [2nd Cir 2013]).

Here, there can be no dispute that once the money was in the correspondent account -- a time when only Pictet held title to the funds -- the bank affirmatively and deliberately transferred the money to Switzerland on behalf of the ARPD employees (see Sigmoil Resources, N.V. v Pan Ocean Oil Corp.(Nigeria) et al., 234 AD2d 103 [1st Dept 1996]). But the dissent is apparently troubled by the absence of an affirmative act by Pictet in directing the money *into* the New York correspondent bank account.[2]

The first problem with this line of reasoning is that nowhere in the record of Licci is there any indication that the defendant, Lebanese Canadian Bank [LCB], itself played a role in choosing to use the New York correspondent account. Rather, as the majority points out, the only evidence in the record is that

---

[2]  If this is indeed the missing piece for the dissent, it would seem remand for additional discovery would be in order to determine what role if any Chambaz or others at Pictet played in the routing of funds to New York. Certainly, given the allegations concerning the establishment of the front company in the British Virgin Islands, there is enough to warrant that step. It is certainly as sufficient as the initial showing made by plaintiff in our first Amigo Foods decision -- when we remitted that case to the trial court for further discovery (39 NY2d at 396). While acknowledging that such a request had been made by plaintiff pursuant to CPLR 3211(d), the lower court denied discovery because it mistakenly believed the argument abandoned, not for any "failure" in the affidavits submitted (2014 WL 4226466; see dissenting op at n 2). Given that jurisdictional issues in long-arm cases are likely to be complex, discovery is "desirable, indeed may be essential, and should quite probably lead to a more accurate judgment than one made solely on the basis of inconclusive preliminary affidavits (Peterson v Spartan Ind., 33 NY2d 463, 467 [1974]).

Hizballah directed the use of that account[3] for deposit of funds ultimately used to further the terrorist goals of that organization.  If such facts -- the specific nature of the commercial transaction and the bank's unilateral choice of the corresponding account venue to effect the transfer -- truly formed the underpinning of our holding, it is odd to say the least that they are not articulated in our decision.  Rather, the relevant allegations were that "LCB used this correspondent account . . . to transfer several million dollars by means of 'dozens' of international wire transfers on behalf of Shahid; that LCB knew that Hizballah was a terrorist organization and that Shahid was part of its financial arm; that the wire transfers 'caused, enabled and facilitated the terrorist rocket attacks'. . .; and that LCB knew that Hizballah required wire transfer services in order to . . . carry out such terrorist attacks" (Licci, 20 NY3d at 332).

Second, just as the Lebanese bank did in Licci, Pictet provides a correspondent account in this State as a service to its clients.  The client here -- the same front company established with the help of the bank -- used that service approximately 15 times to transfer millions of dollars in U.S. currency to Pictet accounts in Geneva.  Funds arrived into the

---

[3]The complaint alleged that the Hizballah accounts were maintained at "various LCB branches in Lebanon" and were "titled to the Shahid (Martyrs) Foundation," (2009 WL 3639957 [SDNY, amend. compl. 45-46]).

New York correspondent account, at the direction of the front company that the bank helped establish, from those vendors in China, U.A.E., Norway and the United States and were then wire transferred to Pictet accounts in Switzerland in U.S. dollars. Pictet's actions in clearing these transactions through its New York correspondent account for a client depositing millions dollars into that Swiss bank was certainly "affirmative and deliberate" and done for the bank's own commercial purposes. That purposeful activity stands in stark contrast to Aroostook's passive receipt of a fund transfer from a third-party's bank routed through New York for the sole convenience of that third-party (Amigo Foods, 61 AD2d at 897).[4]

Moreover, although much more critical to the analysis of the second prong discussed briefly below, the allegations that Pictet was a knowing participant -- as a coconspirator or aider and abettor -- in the wrongdoing strongly supports a finding of purposeful availment. Pictet, it is alleged, had a shared purpose with the corrupt ARPD employees -- to further the kickback scheme -- in the same manner the Lebanese bank in Licci

---

[4]If in Licci, LCB had helped Hizballah establish Shahid as a front company, Shahid had then directed donors to deposit funds in the LCB correspondent account in New York, that money was wired from that LCB bank account to a Shahid account at LCB in Lebanon, and it was then dispersed to individuals intending to carry out terrorist attacks -- all with a collective purpose to further the terrorist goals of Hizballah -- the dissent would find no "purposeful availment" under prong one of our long-arm test.

was alleged to have shared Hizballah's terrorist goals.  Use of a correspondent bank account in New York was a deliberate step by clients in both cases to move funds central to these shared goals.  In neither case was the use of a New York correspondent account merely "coincidental."

Accordingly, the finding that the actions of Pictet satisfy prong one of our test for long-arm jurisdiction is in keeping with both Amigo Foods and Licci and is not in any way a "retreat" from the principles articulated in those cases.[5]

### III.

As the dissent finds that plaintiff has failed the jurisdictional test on prong one, there is no discussion of the application of the "arising from" prong. "[A]t minimum," all that is required is "a relatedness" so that the legal claim is not "completely unmoored" from the transactions (Licci, 20 NY3d at 339).  As noted above, plaintiff alleges that Pictet aided and abetted the ARPD employees breach of their fiduciary duties to their employer and conspired with them to do the same.  Pictet is alleged to have used its New York correspondent account to knowingly transfer the proceeds of the kickback scheme -- acting this way to assist the ARPD employees in profiting from their

---

[5]As the majority notes, Supreme Court should still address the forum non conveniens issue (majority op at 22). In that context, our State's interest in the integrity of its banking system may again be considered along with factors militating against resort to a New York forum (see Mashreqbank PSC v Ahmed Hamad Al Gosaibi & Bros. Co. et al., 23 NY3d 129, 137 [2014]).

breach of fiduciary duty (see id. at 340). This is sufficient to establish an articulable nexus between the use of the correspondent account and the claims asserted (id. at 339).

IV.

"It should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use" (Licci, 732 F3d at 171-172). The conclusion that personal jurisdiction attaches in a case brought by victims of such wrongs may well chill foreign banks from taking advantage of this State's banking system to knowingly forward money for terrorist purposes, or to knowingly launder the proceeds of illegal activity. So be it.

Rasheed al Rushaid, et al. v Pictet & Cie, et al.

No. 180

PIGOTT, J.(dissenting):

CPLR 302(a)(1) does not confer personal jurisdiction over a foreign bank when, as in this case, the bank's only connection to New York is the maintenance of a New York correspondent account and the passive receipt of payments into that account, at the unilateral direction of third parties.  The majority's contrary conclusion is based on a misreading of Licci v Lebanese Canadian Bank (20 NY3d 327 [2012]), in which we held that a foreign bank was subject to personal jurisdiction because it deliberately and repeatedly wired money through its New York correspondent account into the hands of Hizballah, to effect terrorist goals shared by the bank.  In ignoring the significant distinctions between Licci and this case, the majority risks upending over forty years of precedent that holds the mere maintenance of a New York correspondent account is insufficient to assert personal jurisdiction over a foreign bank. Accordingly, I dissent.

- 1 -

New York's long-arm statute authorizes a court to exercise personal jurisdiction over any non-domiciliary who transacts business within the state, if the cause of action arises from such acts (see CPLR 302[a][1]).  "Although it is impossible to precisely fix those acts that constitute a transaction of business, our precedents establish that it is the quality of the defendants' New York contacts that is the primary consideration" (Fischbarg v Doucet, 9 NY3d 375, 380 [2007]).  Specifically, we look for "[p]urposeful activities" in which a party, "through volitional acts, avails itself of the privilege of conducting activities within the forum State" (id. [internal quotations omitted]).  For example, in Fischbarg, we upheld the exercise of personal jurisdiction over out-of-state defendants who had retained an attorney in New York to represent them in a foreign proceeding, because they "projected themselves into our state's legal services market" and, "on their own volition," chose to utilize the plaintiff's services (id. at 382).

So, too, in Licci, the foreign bank projected itself into this State by affirmatively and deliberately transferring money on behalf of a client, through its New York correspondent account, to Hizballah (see 20 NY3d at 340).  The evidence in Licci established that the bank "could have . . . processed U.S.-dollar-denominated wire transfers for the Shahid account through correspondent accounts anywhere in the world," yet it "deliberately chose to process the many Shahid wire transfers

through AmEx in New York" (Licci ex rel. Licci v Lebanese Can.
Bank, 732 F3d 161, 171 [2d Cir 2013] [emphasis added]).  What is
more, the bank in Licci transferred the funds through its New
York account "to effect its [the bank's] . . . shared terrorist
goals" (Licci, 20 NY3d at 340 [emphasis added]).

        "Not all purposeful activity, however, constitutes a
transaction of business within the meaning of CPLR 302(a)(1)"
(Fischbarg, 9 NY3d at 380).  In stark contrast to Licci, the
foreign bank in Amigo Foods Corp. v Marine Midland Bank-New York
was held not to have purposefully availed itself of the privilege
of conducting activities in New York where it maintained a New
York correspondent account and had "passively and unilaterally
been made the recipient of funds which, at its customers'
direction, it ha[d] declined" (61 AD2d 896, 897 [1st Dept 1978],
affd for reasons stated 46 NY2d 855 [1979]).  A depositor's
"unilateral choice" to deposit money into the bank's account did
not suddenly transform a correspondent banking relationship into
the kind of volitional act that is required under the long-arm
statute (id.).

        If there were any confusion as to the meaning of our
decision in Amigo Foods, we put it to rest in Licci.  There, we
clarified that

            "Amigo Foods [i]s best read as standing for
            the proposition that the first prong of the
            long-arm jurisdiction test . . . may be
            satisfied by the defendant's use of a
            correspondent bank account in New York, even
            if no other contacts between the defendant

and New York can be established, *if* the
defendant's use of that account was
purposeful"

(<u>Licci</u>, 20 NY3d at 338, quoting <u>Licci ex rel. Licci v Lebanese
Can. Bank, SAL</u>, 673 F3d 50, 66 [2d Cir 2012] [emphasis in
original]).  We described the bank's use of its correspondent
account in <u>Amigo Foods</u> as "essentially adventitious -- i.e., *it
was not even [the bank]'s doing*," whereas the bank's actions in
<u>Licci</u> -- knowingly and unlawfully transferring funds to Hizballah
on its client's behalf to accomplish the bank's terrorist goals
-- demonstrated the kind of purposeful availment contemplated by
CPLR 302(a)(1) (<u>id.</u> at 338, 340 [emphasis added]).

Our decision in <u>Licci</u> thus confirmed the rule, based in
prior case law, that something more than the mere receipt of
funds in a New York correspondent account is required in order to
assert personal jurisdiction over a foreign bank (<u>see Faravelli v
Bankers Trust Co.</u>, 59 NY2d 615, 618 [1983], <u>affg for reasons
stated</u> 85 AD2d 335, 339 [1st Dept 1982] [foreign bank not subject
to personal jurisdiction under the long-arm statute where it
directed a New York bank to remit payment from a purchase
contract to the foreign bank's New York correspondent account];
<u>Nemestky v Banque de Developpement de la Republica Du Niger</u>, 48
NY2d 962, 964 [1979] [foreign bank's maintenance of a New York
correspondent account was insufficient to assert personal
jurisdiction, even if bank's guarantee of the trade acceptance
upon which plaintiff brought suit arose from the bank's

correspondent banking relationship]; cf. Banco Ambrosiano v Artoc Bank & Trust, 62 NY2d 65, 70 [1984] [plaintiff conceded lack of personal jurisdiction over foreign bank whose only contact with New York was maintenance of a New York correspondent account into which the funds that were the subject of the action were deposited]).[1]

Rather, a foreign entity must initiate purposeful contact with New York, beyond the mere maintenance of a correspondent account, in order for its relationship with a New York bank to form the basis for the exercise of personal jurisdiction (see 20 NY3d at 338-339; Ehrlich-Bober & Co. v Univ. of Houston, 49 NY2d 574, 581-582 [1980] [public university in Texas that maintained a correspondent account in New York subject to personal jurisdiction because it had solicited the funds that were the subject of the action and specifically directed that they be placed in the account]). Accordingly, the foreign bank in Indosuez International Finance B.V. v National Reserve Bank (98 NY2d 238 [2002]) was subject to personal jurisdiction where the bank itself entered into numerous contracts with the plaintiff and specified that payments under those contracts were

---

[1] The majority's reliance on Banco Ambrosiano is misplaced (majority op at 12). Our decision in that case was limited to an analysis of quasi in rem jurisdiction, as the plaintiff had conceded that personal jurisdiction was lacking (62 NY2d at 69-70). We cited Banco only once in Licci, as an example of a case in which we "discussed similar or related issues" involving a foreign bank's use of a correspondent account (20 NY3d at 335).

to be made into the bank's New York account, for the benefit of the bank.  Unlike the foreign bank in <u>Amigo Foods</u>, whose only contact with New York was the maintenance of a correspondent account into which other parties unilaterally chose to deposit funds, the foreign bank in <u>Indosuez</u> was itself a party to the contract that had required payments to be made into its correspondent account (<u>id.</u> at 246-247).  The bank had also expressly designated New York as the place of performance and submitted to New York jurisdiction in six of its agreements (<u>id.</u>).

Here, defendants' sole connection to New York was the maintenance of a correspondent account at Citibank, N.A., into which third party vendors deposited funds that were alleged to be the proceeds of bribes and kickbacks obtained by foreign "corrupt employees" in connection with a Saudi Arabian construction project.  Although plaintiffs generally alleged that defendants knew about the employees' unlawful activities overseas and helped them to set up a company in the British Virgin Islands, with bank accounts in Geneva, plaintiffs have not identified any volitional act on the part of defendants that was directed at New York.

Indeed, the only intentional conduct alleged in the complaint that relates in any way to New York was carried out by the foreign employees -- who directed the vendors to wire the bribes and kickbacks to "Citibank[, N.A.], New York, in favour of 'Pictet and Co. Bankers Geneva,' for the credit of" the

employees' overseas account -- and the vendors, who followed that direction.  Nowhere is it alleged that defendants "orchestrated the laundering of funds . . . to Pictet's New York correspondent bank account" (majority op at 3), or that "the vendors' choice to deposit money in New York was . . . part of defendant's design" (majority op at 16), as it was in Licci (see Licci, 732 F3d at 171 [bank "deliberately chose" to process the transfers through AmEx in New York]).[2]

Like the foreign bank in Amigo Foods, Pictet has not wired money through its New York correspondent account, nor has it initiated any other contact with the forum state such as the kind we found dispositive in Licci and Indosuez.  Even accepting as true all of the facts alleged in the amended complaint, Pictet was nothing more than an "adventitious" recipient of money that had been transferred into its account at the unilateral direction of foreign nationals, which is insufficient under section 302(a)(1) to exercise personal jurisdiction over a foreign bank.

The majority's interpretation of Licci and, consequently, its determination that Pictet's receipt of funds at the direction of others constitutes the purposeful transaction of business in New York, is a complete about-face from the rule that

---

[2] Because the plaintiffs failed to submit affidavits in opposition to the motion to dismiss that would suggest "facts essential to justify opposition may exist but cannot then be stated," they have not satisfied the procedural requirements of CPLR 3211(d) that would entitle them to further jurisdictional discovery.

we established in Amigo Foods, and to which foreign banks have fashioned their conduct for over four decades -- namely, that maintenance of a New York correspondent account, standing alone, will not subject them to jurisdiction in this state.  The majority's retreat from that principle eschews the clear and predictable rules that are important in this area of the law, and will have grave implications for correspondent banking relationships, which "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States" (Licci, 20 NY3d at 338).[3]

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order reversed, with costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.  Opinion by Judge Rivera.  Judges Abdus-Salaam, Fahey and Garcia concur, Judge Garcia in a concurring opinion in which Judge Abdus-Salaam concurs.  Judge Pigott dissents and votes to affirm in an opinion in which Chief Judge DiFiore and Judge Stein concur.

Decided November 22, 2016

---

[3] In light of my conclusion that defendants did not transact business in this state, I have no need to consider the sufficiency of plaintiffs' allegations with respect to the second prong of the long-arm statute (see CPLR 302[a][1]) or whether the exercise of personal jurisdiction in this case satisfies due process (see Walden v Fiore, 134 S Ct 1115, 1121 [2014]).