Salter v Meta Platforms, Inc. (2025 NY Slip Op 04384)

Salter v Meta Platforms, Inc.

2025 NY Slip Op 04384

Decided on July 25, 2025

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 25, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: LINDLEY, J.P., CURRAN, BANNISTER, SMITH, AND NOWAK, JJ.

527 CA 24-00450

[*1]KIMBERLY J. SALTER, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF AARON W. SALTER, JR., DECEASED, ET AL., PLAINTIFFS-RESPONDENTS,
v
META PLATFORMS, INC., FORMERLY KNOWN AS FACEBOOK, INC., ET AL., DEFENDANTS, AND MEAN L.L.C., DEFENDANT-APPELLANT. (APPEAL NO. 1.) 

RENZULLI LAW FIRM, LLP, WHITE PLAINS (JEFFREY M. MALSCH OF COUNSEL), FOR DEFENDANT-APPELLANT. 
CONNORS LLP, BUFFALO (JAMES W. GRABLE, JR., OF COUNSEL), FOR PLAINTIFFS-RESPONDENTS. 

 Appeal from an order of the Supreme Court, Erie County (Paula L. Feroleto, J.), entered February 9, 2024. The order denied the motion of defendant MEAN L.L.C. to dismiss the complaint against it. 
It is hereby ORDERED that the order so appealed from is unanimously affirmed without costs.
Memorandum: In May 2022, an 18-year-old man (shooter) committed a racially motivated mass shooting at a grocery store in Buffalo. Multiple people were killed or injured in the attack. These four appeals arise from four separate actions commenced by various plaintiffs, consisting of surviving victims of the shooting, the survivors and estates of those who died, and those who were in the store on the day of the attack. The defendants in these actions consist of numerous entities and individuals, including those allegedly involved in arming the shooter with firearms and body armor as well as various social media platforms that allegedly radicalized the shooter to commit the racially motivated crimes.
We have had several related appeals regarding these actions (see Patterson v Meta Platforms, Inc. [appeal No. 1], — AD3d — [July 25, 2025] [4th Dept 2025] [decided herewith]; Salter v Meta Platforms, Inc., — AD3d — [June 27, 2025] [4th Dept 2025]). The instant appeals concern, in particular, defendant MEAN L.L.C. (MEAN), which manufactured and sold the magazine lock on the Bushmaster XM-15 semiautomatic rifle the shooter used during the incident. It is undisputed that the shooter removed that lock, thereby illegally modifying the firearm so as to allow it to have detachable high capacity magazines not permitted in New York (see Penal Law §§ 265.00 [22] [a], [g] [ii]; 265.02 [7]; 265.10). With respect to MEAN, plaintiffs in these actions asserted various causes of action, including negligence, public nuisance and violations of General Business Law §§ 349 and 350.
According to plaintiffs' allegations, MEAN manufactured a magazine lock that was intended to permanently lock a limited-capacity magazine into the Bushmaster firearm, so that the firearm would be compliant with the New York State Secure Ammunition and Firearms Enforcement Act ([SAFE Act] L 2013, ch 1; see Penal Law § 265.00 [22], [23]; see generally Schulz v State of N.Y. Exec., 134 AD3d 52, 54-55 [3d Dept 2015], appeal dismissed 26 NY3d 1139 [2016], reconsideration denied 27 NY3d 1047 [2016]). At the time the shooter purchased the Bushmaster, the MEAN lock had already been installed on the firearm. Plaintiffs further [*2]alleged that MEAN marketed that lock and similar locks to New York customers, under the auspices that it would make their firearm compliant with New York law. Despite the lock's alleged permanence, MEAN also included instructions on its packaging and its website on how to remove the lock, thereby allowing the shooter to illegally modify the firearm and remove the lock in order to load large-capacity magazines, like the one the shooter used on the day of the shooting.
MEAN filed four separate CPLR 3211 motions seeking to dismiss against it the operative complaints (complaints) filed by the plaintiffs in these actions, i.e., the complaint filed in the action in appeal No. 1 by the plaintiffs therein, the complaint filed in the action in appeal No. 2 by the plaintiffs therein, the amended complaint filed in the action in appeal No. 3 by the plaintiff therein (Jones), and the second amended complaint filed in the action in appeal No. 4 by the plaintiffs therein (Stanfield plaintiffs). In appeal Nos. 1 through 4, MEAN appeals from the respective orders denying those four motions. We reject MEAN's contentions and affirm the orders in all four appeals.
MEAN based all four motions on the same grounds, contending that it was entitled to immunity under the Protection of Lawful Commerce in Arms Act ([PLCAA] 15 USC § 7901 et seq.), that plaintiffs lacked standing to bring the General Business Law causes of action (see CPLR 3211 [a] [3]), that the complaints failed to state a cause of action (see CPLR 3211 [a] [7]), and that Supreme Court lacked personal jurisdiction over MEAN (see CPLR 3211 [a] [8]). MEAN advances all of those same contentions on these appeals.
It is well established that, "[w]hen reviewing a motion to dismiss pursuant to CPLR 3211, we must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (Williams v Beemiller, Inc., 100 AD3d 143, 148 [4th Dept 2012], amended on rearg 103 AD3d 1191 [4th Dept 2013] [internal quotation marks omitted]; see generally Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
Here, addressing first the issue of jurisdiction, we reject MEAN's contention that the court may not exercise personal jurisdiction over it. New York's long-arm statute confers personal jurisdiction over "any non-domiciliary . . . who in person or through an agent" either "transacts any business within the state or contracts anywhere to supply goods or services in the state" (CPLR 302 [a] [1]). Jurisdiction may also be exerted over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state . . . if [it] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3]; see Licci v Lebanese Can. Bank, SAL, 20 NY3d 327, 339 [2012]; see generally International Shoe Co. v Washington, 326 US 310, 316 [1945]).
MEAN purposefully availed itself of the New York market by making representations about the effects of its lock for New York residents, and it received the benefits of that intentional connection regardless of whether the particular lock in question here was actually sold in New York (see Aybar v US Tires & Wheels of Queens, LLC, 211 AD3d 40, 50-51 [2d Dept 2022]). In light of all the circumstances, we conclude that plaintiffs' allegations establish the requisite " 'articulable nexus' . . . or 'substantial relationship' . . . between the business transaction and the claim[s] asserted" (Licci, 20 NY3d at 339).
MEAN next contends that it is entitled to immunity from suit as a result of the PLCAA and that no exception to immunity exists. We reject that contention. The PLCAA immunizes, to some degree, "manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended" (15 USC § 7901 [b] [1]). In enacting the legislation, Congress determined that such entities "are not, and should not, be [sic] liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended" (§ 7901 [a] [5]; see § 7902 [a]; Ileto v Glock, Inc., 565 F3d 1126, 1135 [9th Cir 2009], cert denied 560 US 924 [2010]), and that there was a need "[t]o prevent the use [*3]of such lawsuits to impose unreasonable burdens on interstate and foreign commerce" (§ 7901 [b] [4]).
Under the PLCAA, a manufacturer is any entity "who is engaged in the business of manufacturing [a qualified product] in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under [18 USC § 921 et seq.]" (15 USC § 7903 [2]). We reject MEAN's contention that the phrase "manufacturer or seller of a qualified product" in section 7903 (5) (A) should be read to divorce "manufacturer" from "qualified product" and grant immunity to any manufacturer in the firearms industry from suit based on the misuse of a qualified product. Inasmuch as the statute defines "manufacturer" only by reference to a qualified product (§ 7903 [2]), we do not agree that the term "manufacturer" can ever encompass an entity that does not make or sell a qualified product.
We agree with MEAN, however, that it does not fall outside the "engaged in the business" prong of 15 USC § 7903 (2). The PLCAA defines that phrase by reference to section 921 (a) (21) of the Gun Control Act of 1968 ([GCA] 18 USC § 921 [a] [21]), and we see no basis to incorporate other sections of the GCA that limit its application to importers, manufacturers, or dealers of firearms and ammunition (see
§ 923 [a]). The PLCAA provision regarding manufacturers incorporated only the GCA definition of the phrase "engaged in the business" and, as a result, we rely on only that definition in evaluating plaintiffs' allegations. As a result, we conclude that MEAN established that it is "engaged in the business" of manufacturing a qualified product under the PLCAA by establishing that it "devotes time, attention, and labor to manufacturing [its qualified product] as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution [thereof]" (§ 921 [a] [21] [A], [B]).
Thus, we conclude that MEAN met the first prong of the definition of "manufacturer" under the PLCAA by establishing that it is an entity "engaged in the business" of manufacturing what it asserts to be a "qualified product" in interstate commerce (15 USC § 7903 [1], [2]). Inasmuch as MEAN submitted its federal license to manufacture firearms in support of its motions, we further conclude that MEAN met the second prong by establishing that it is licensed to engage in business as such a manufacturer (see § 7903 [2]). It would defy the intent of the statute to deny PLCAA immunity to MEAN simply because a federal firearms manufacturing license is not actually required to manufacture the lock.
Having determined that MEAN qualifies as a manufacturer under the PLCAA, we next address whether its lock constitutes a "qualified product" under the statute. We answer that question in the affirmative, contrary to the court's determination. A "qualified product" is "a firearm . . . or ammunition . . . or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce" (15 USC § 7903 [4] [emphasis added]; see Prescott v Slide Fire Solutions, L.P., 341 F Supp 3d 1175, 1187 [D Nev 2018]). Here, as in Prescott, the question is whether the lock is a "component part of a firearm" (§ 7903 [4]) or a "mere firearm accessory" (Prescott, 341 F Supp 3d at 1187; see Duncan v Bonta, 133 F4th 852, 860 [9th Cir 2025]).
"Because the PLCAA does not define 'component part,' [courts] must employ the traditional rules of statutory interpretation" (Prescott, 341 F Supp 3d at 1188, citing United States v Laursen, 847 F3d 1026, 1032 [9th Cir 2017]) and, in so doing, " 'assum[e] that the ordinary meaning of th[e] language [employed by Congress] accurately expresses the legislative purpose' " (id., quoting Gross v FBL Fin. Servs., Inc., 557 US 167, 175-176 [2009]). That analysis begins with the " 'plain and common meaning of the word derived from dictionary definitions' " (id., quoting Laursen, 847 F3d at 1032).
A "component" is defined as a "constituent part" or "ingredient" (Merriam-Webster.com Dictionary, component). A "constituent" is defined, as relevant here, as "[o]ne part of something that makes up a whole; an element" (Black's Law Dictionary [11th ed 2019], constituent). Courts that have engaged in such analysis have concluded that a component part of a firearm is one that is essential or integral to its use or operation (see Prescott, 341 F Supp 3d at 1188; Duncan, 133 F4th at 868). Unlike cable locks (see Sambrano v Savage Arms, Inc., 338 P3d 103, 105 [NM Ct App 2014]), the MEAN lock, once installed, becomes "an integral part of the firing mechanism" of the rifle and "necessary for the ordinary operation of a protected weapon" [*4](Duncan, 133 F4th at 867-868). Like the bump stock in Prescott, the item at issue here is an aftermarket feature that replaces an existing component part, " 'rendering [it a] component part[ ], even if [it is an] after-market enhancement[ ]' " (Lowy v Daniel Defense, LLC, 2024 WL 3521508, *3, 2024 US Dist LEXIS 131253, *12 [ED Va, July 24, 2024, No. 1:23-CV-1338], quoting Prescott, 341 F Supp 3d at 1190; see United States v Gonzalez, 792 F3d 534, 537 [5th Cir 2015]).
In Lowy, the court determined that, "when a firearm user substitutes the original components of their firearm for defendants' magazines and grips, defendants' magazines and grips then become component parts of the newly assembled firearm" (2024 WL 3521508, *3, 2024 US Dist LEXIS 131253, *12). Here, the original magazine release button, a component, was substituted with MEAN's magazine lock. As a result, we conclude that the MEAN lock became a qualified product under the PLCAA and, unless an exception applies, MEAN is entitled to PLCAA immunity.
In opposition to the motions and in opposition to the current appeals, all plaintiffs rely on two statutory exceptions to immunity under the PLCAA, namely, the negligence per se exception (15 USC
§ 7903 [5] [A] [ii]), which exempts actions brought against a "seller" for "negligent entrustment or negligence per se," and the predicate exception (§ 7903 [5] [A] [iii]), which exempts manufacturers and sellers from immunity in actions "in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." Jones and the Stanfield plaintiffs also asserted that MEAN aided and abetted the shooter's violation of the SAFE Act.
Addressing the predicate exception first, we reject MEAN's contention that the predicate exception does not apply to General Business Law §§ 349 and 350. MEAN contends that the predicate exception does not apply to "laws of general applicability" like General Business Law §§ 349 and 350, which forbid "[d]eceptive acts or practices" (§ 349 [a]) and "[f]alse advertising" (§ 350) in the conduct of any commerce in New York (see generally Ileto, 565 F3d at 1133-1138; City of New York v Beretta U.S.A. Corp., 524 F3d 384, 400-404 [2d Cir 2008], cert denied 556 US 1104 [2009]). The cases upon which MEAN relies are distinguishable because those cases involve general criminal or negligence statutes. Here, in contrast, plaintiffs rely on statutes that specifically deal with the sale or marketing of any product in New York.
General Business Law §§ 349 and 350 involve the general marketing and sale of products in New York and, as a result, bring plaintiffs' actions within the ambit of the predicate exception because those provisions target conduct expressly aimed at conducting business within New York (see Soto v Bushmaster Firearms Intl., LLC, 331 Conn 53, 70, 118-158, 202 A3d 262, 275, 302-325 [2019], cert denied — US &mdash, 140 S Ct 513 [2019]; compare General Business Law §§ 349, 350, with Conn Gen Stat § 42-110b [a]; see also Doyle v Combined Sys., Inc., 2023 WL 5945857, *10-11, 2023 US Dist LEXIS 161087, *30-31 [ND Tex, Sept. 11, 2023, No. 3:22-CV-01536-K]; Goldstein v Earnest, 2021 WL 12321922, *4-5 [Cal Super Ct, July 2, 2021, No. 37-2020-00016638-CU-PO-CTL]; Prescott v Slide Fire Solutions, LP, 410 F Supp 3d 1123, 1137-1139 [D Nev 2019]).
With respect to whether MEAN "knowingly" violated General Business Law §§ 349 and 350 for purposes of 15 USC § 7903 (5) (A) (iii), we conclude that the allegations in the complaints are sufficient to withstand CPLR 3211 dismissal. In the context of these motions to dismiss, plaintiffs' allegations that MEAN knowingly and falsely promoted its lock with claims that it would bring customers' rifles into compliance with New York law are sufficient to permit application of the predicate exception with respect to violations of General Business Law §§ 349 and 350 (see Williams, 100 AD3d at 148-151; see generally People v Steinmetz, 177 AD3d 1292, 1293 [4th Dept 2019], lv denied 34 NY3d 1133 [2020]).
Furthermore, with respect to the assertions of Jones and the Stanfield plaintiffs, we conclude that, even assuming, arguendo, that the predicate exception to the PLCAA applies only to firearm-specific statutes, and not general statutes such as those set forth in the General Business Law, the SAFE Act is undisputedly a firearm-specific statute, and Jones and the Stanfield plaintiffs sufficiently alleged that MEAN aided and abetted violation of that statute. [*5]MEAN's contention that generalized aiding and abetting statutes are "clearly not sufficient to be classified as predicate statutes" under the PLCAA is belied by Smith & Wesson Brands, Inc. v Estados Unidos Mexicanos (— US &mdash, &mdash, 145 S Ct 1556, 1562 [2025]), where the Supreme Court stated that "the predicate violation PLCAA demands may come from aiding and abetting someone else's firearms offense."
Although the Supreme Court determined that the complaint in Smith & Wesson Brands, Inc. did not sufficiently allege that the defendant gun manufacturers aided and abetted the unlawful sales of firearms by gun dealers to Mexican drug cartels, the aiding and abetting allegations in the complaints of Jones and the Stanfield plaintiffs are stronger and more direct than those found wanting in Smith & Wesson Brands, Inc. Specifically, their complaints allege in sum and substance that MEAN knew that its "permanent" lock was not at all permanent and could easily be removed so as to convert a lawful rifle with a fixed 10-round magazine into an unlawful assault rifle with a detachable high capacity magazine. Indeed, their complaints alleged, inter alia, that MEAN instructed people, through videos and on its packaging, on how to remove the "permanent" lock and thereby facilitate a violation of the SAFE Act, and that it is because of those instructions that the shooter chose to buy an AR-15 with a MEAN lock attached. Whether Jones and the Stanfield plaintiffs can establish their allegations of aiding and abetting will be determined on summary judgment or at trial, but for purposes of pleading we conclude that their complaints sufficiently state a cause of action under the predicate exception to the PLCAA.
With respect to the causation element of 15 USC § 7903 (5) (A) (iii), we reject MEAN's contention that it is entitled to dismissal at this stage. It is too early to determine as a matter of law whether "only one conclusion can be drawn" on the issue of causation (Bell v Board of Educ. of City of N.Y., 90 NY2d 944, 946 [1997]). "Typically, the question of whether a particular act of negligence is a substantial cause of the plaintiff's injuries . . . turns upon questions of foreseeability[,] and what is foreseeable and what is normal may be the subject of varying inferences" (Hain v Jamison, 28 NY3d 524, 529 [2016] [internal quotation marks omitted]). Although the shooter's act of modifying the Bushmaster to remove the lock could be an intervening cause, the criminal act of a third party may be "a 'reasonably foreseeable' consequence of circumstances created by [a] defendant" (Bell, 90 NY2d at 946; see Williams, 100 AD3d at 152).
In light of our conclusion that plaintiffs' actions may fall within the PLCAA's predicate exception and therefore are not precluded by the PLCAA, we "need not address [whether these] action[s] fall[ ] within the PLCAA's negligent entrustment or negligence per se exception" (Williams, 100 AD3d at 151).
MEAN further contends that plaintiffs' causes of action under General Business Law §§ 349 and 350 should have been dismissed for failure to state a cause of action. We reject that contention. Plaintiffs sufficiently alleged that " '[MEAN] has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff[s] suffered injury as a result of the allegedly deceptive act or practice' " (Koch v Acker, Merrall & Condit Co., 18 NY3d 940, 941 [2012]; see Karlin v IVF Am., 93 NY2d 282, 293 [1999], rearg denied 93 NY2d 989 [1999]). Plaintiffs alleged that MEAN knowingly misrepresented its lock to New York customers—including the shooter specifically—in order to bring rifles into compliance with state gun laws. The Court of Appeals "has recognized that General Business Law §§ 349 and 350 'on their face apply to virtually all economic activity, and their application has been correspondingly broad' " (Plavin v Group Health Inc., 35 NY3d 1, 9 [2020], quoting Karlin, 93 NY2d at 290).
Contrary to MEAN's further contention, plaintiffs have the requisite standing to bring their General Business Law causes of action against MEAN, i.e., they were the persons injured by the alleged violations of General Business Law § 349 (h), and their allegations are not, as MEAN contends, just "derivative of other consumers' exposure to the alleged misleading statements." What is required for standing purposes is only "that the party actually injured be the one to bring suit" (Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc., 3 NY3d 200, 208 [2004]; see Soto, 331 Conn at 96-100, 202 A3d at 289-291). As noted above, MEAN's challenge to the causal connection between MEAN's allegedly tortious acts and plaintiffs' injuries cannot, at this stage, be determined in MEAN's favor as a matter of law.
Finally, MEAN contends that the negligence and public nuisance causes of action, which are asserted by some but not all of the plaintiffs in these actions, should have been dismissed. We reject that contention (see Williams, 100 AD3d at 151-152). With respect to the negligence causes of action, the relevant plaintiffs have alleged that the shooter used MEAN's own instructions to remove the lock from the firearm (cf. Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 233 [2001]), and the shooter's "intervening criminal act does not necessarily sever the causal connection between the alleged negligence of [MEAN] and plaintiff[s'] injur[ies]" (Williams, 100 AD3d at 152; see Bell, 90 NY2d at 947).
With respect to the public nuisance causes of action, we conclude that the allegations made by the relevant plaintiffs are sufficient to withstand CPLR 3211 dismissal. As stated above, plaintiffs all alleged that MEAN violated New York law by manufacturing a lock that was removable, thereby posing a danger to the general public, and that plaintiffs or their relatives were injured by the firearm from which the lock was removed (see Williams, 100 AD3d at 152; see generally Bell, 90 NY2d at 946). As in Williams, the relevant plaintiffs here "have alleged that [MEAN] engaged in unlawful conduct that endangered the lives of 'a considerable number of persons' " (100 AD3d at 152, quoting Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d 564, 568 [1977], rearg denied 42 NY2d 1102 [1977]), and that they "suffered special injury beyond that suffered by the community at large" (id. [internal quotation marks omitted]; see generally Beretta U.S.A. Corp., 524 F3d at 389-390).
Entered: July 25, 2025
Ann Dillon Flynn
Clerk of the Court